McKINLEY v. WILLIAMS.

(Circuit Court of Appeals, Eighth Circuit. April 17, 1896.)

No. 690.

1. PRINCIPAL AND AGENT—BETRAYAL OF TRUST—ILLEGITIMATE PROFITS.

An agent of a vendor, who speculates in the subject-matter of his agency, or intentionally becomes interested in it as a purchaser, or as the agent of a purchaser, violates his contract of agency, betrays his trust, forfeits his commission as agent, and becomes indebted to his principal for the profits he gains by his breach of duty.

2. CONTRACTS IN WRITING—MODIFICATION BY PAROL.

Where the parties have deliberately put their engagements into writing, in terms importing a legal obligation, without any uncertainty as to the object or extent of such engagements, it is conclusively presumed that their whole agreement, and the manner and extent of their undertaking, were included in the writing, and it cannot be shown that a parol modification was made before the contract was put in writing.

3. PRINCIPAL AND AGENT—CONTRACT FOR AGENT'S ADVANTAGE—BAD FAITH.

An alleged contract, whereby an agent is permitted by his principal to retain certain of the profits made from dealings in the subject-matter of the agency, will not be allowed to stand where the agent failed to disclose, before the contract was made, the material facts and circumstances in relation to the sale, and the extent of his own profits.

4. SAME—WANT OF CONSIDERATION.

An alleged parol agreement by an agent acting under a written contract of agency to pay the necessary expense of exploring for ore and developing mines on the lands of his principal, preparatory to leasing them to others, cannot constitute a valid consideration for an alleged parol agreement of the principal to permit the agent to retain certain profits made in effecting the lease, where the written contract of agency itself requires the agent to pay such expenses.

5. SAME—EFFECT OF RATIFICATION BY PRINCIPAL.

The fact that the principal ratifies certain acts of his agent, by which the latter makes a profit out of his dealings in the subject-matter of his trust, is not inconsistent with the nonexistence of an alleged previous parol agreement, under which the agent claims express authority to make such profit.

6. APPEAL—FINDINGS OF FACT—REVIEW.

When the court below has considered conflicting evidence, and made a finding and decree thereon, the finding must be taken as presumptively correct, and the decree should be affirmed, if the appellate court is in doubt in respect to the facts found.

7. MEASURE OF DAMAGES— VIOLATION OF CONTRACT OF AGENCY — CONVERSION OF STOCKS.

An agent who, without the knowledge of his principal, and in violation of his trust, receives and retains for his own benefit certain stocks received in part payment of a contract made in behalf of his principal, is chargeable with the highest market value attained by such stocks between the time of such conversion and a reasonable time after the discovery thereof by the principal, in which the principal may place himself in statu quo. Galigher v. Jones, 9 Sup. Ct. 335, 129 U. S. 193, followed.

Appeal from the Circuit Court of the United States for the District of Minnesota.

This was a bill in equity by John M. Williams against John McKinley and George A. Elder, setting up a contract constituting the said McKinley the agent of complainant, and alleging that he had wrongfully, and in violation of his trust, made profits for himself by dealing in the subject-matter of his agency. The decree below avoided the contract of agency, deprived the agent of his stipulated compensation, and awarded a large recovery for profits wrongfully made. 65 Fed. 4. From this decree, defendant McKinley appealed.

Walter Ayers, for appellant.

I. K. Boyesen (J. L. Washburn and John J. Herrick with him on the brief), for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. The law guards the fiduciary relations with jealous care. It seeks to prevent the possibility of a conflict between the duty and the personal interest of a trustee. It demands that the agent shall work with an eye single to the interest of his principal. It prohibits him from receiving any compensation but his commission, and forbids him from acting adversely to his principal, either for himself or for others. It visits such a breach of duty, not only with the loss of the profits he gains, but with the loss of the compensation which the faithful discharge of duty would have earned. To permit the agent of a vendor to become interested, as the purchaser or as the agent of a purchaser, in the subject-matter of the agency, inaugurates so dangerous a conflict between duty and self-interest, that the law wisely and peremptorily prohibits it. An agent of a vendor, who speculates in the subject-matter of his agency, or intentionally becomes interested in it as a purchaser, or as the agent of a purchaser, violates his contract of agency, betrays his trust, forfeits his commission as agent, and becomes indebted to his principal for the profits he gains by his breach of duty. Warren v. Burt, 12 U. S. App. 591, 595, 7 C. C. A. 105, 107, and 58 Fed. 101, 103; Gunn v. Black, 19 U. S. App. 477, 485, 8 C. C. A. 534, 539, and 60 Fed. 151, 156; Michoud v. Girod, 4 How. 503, 554, 555; Crump v. Ingersoll, 44 Minn. 84, 46 N. W. 141; Hegenmyer v. Marks, 37

Minn. 6, 32 N. W. 785; Jacobus v. Munn, 37 N. J. Eq. 48, 53; Moore v. Zabriskie, 18 N. J. Eq. 51; Perry, Trusts, § 919; Bank v. Tyrrell, 27 Beav. 273, 10 H. L. Cas. 26; Panama & S. P. Tel. Co. v. India Rubber, Gutta Percha & Telegraph Works Co., 10 Ch. App. 515, 526; Bent v. Priest, 86 Mo. 475, 482. This is not the first time this court has been called upon to announce these principles, but the reckless disregard of them, which characterizes the acts of some of the agents whose transactions are portrayed to us, admonishes us that we cannot reiterate them too often, nor enforce them too rigidly. The court below placed the decree from which this appeal was taken upon these indisputable principles. This decree avoids a contract of agency, deprives the agent of his stipulated compensation, and awards to the principal a recovery of $160,827.43, on account of the gains which it finds the agent obtained by violating his contract of agency, and betraying his trust. The agent, John McKinley, appealed from this decree, and his appeal presents two questions: First. Does the proof warrant the finding of the circuit court that the appellant was the agent of the appellee, John M. Williams, to sell leases upon his lands, when he gained the profits with which he is charged? And, second, if .so, was the highest market value, or the amount which he realized from the property which he thus obtained, the measure of his liability to his principal?

The appellee, Williams, alleged in the bill which he filed in the court below in this case that he was a resident of Chicago, Ill.; that the appellant was a resident of Duluth, Minn.; that the latter was his agent to sell leases of certain mineral lands, which he owned in Minnesota, under a written agreement made between them in August, 1891, to the effect that the appellant should sell and dispose of such leases for the mutual interests of both parties to the contract, and should receive one-fifth of the revenues derived from these lands. He also alleged that, to enable his agent to sell such leases to better advantage, he made a formal lease of the land to the appellant, so that he could make an assignment of it in his own name, or could sublet the lands with the written consent of the appellee; that the appellant thereupon sublet several tracts of these lands, and sold his apparent interest in them, under the formal lease to him, for which he received large amounts of money, promissory notes, and stocks in corporations, which he refused to account for or to turn over to his principal. The prayer of the bill was that the appellant should account for, pay over, and assign to the appellee all the money and property which he had acquired from his dealings with these lands, and that the original contract of agency should be canceled. The appellant answered this bill. He alleged in his answer that the formal lease, made at the same time as the contract of agency, was an actual lease; that, under it, he became liable to pay the rents reserved, and obtained the right to all the profits he had realized by selling any part of his leasehold interest thereunder, or by subletting any part of the land described therein. He also alleged that the appellee knew of the profits he was gaining at the times when he received them; that he, nevertheless, assented to the leases and contracts through which he obtained them, and consented that

he should retain these profits for his own benefit. The appellee filed a replication to this answer.

The most salient fact which a careful perusal of this voluminous record discloses is this: The appellant testified, and his counsel was thereby forced to concede, that the main defense pleaded in his answer was baseless. McKinley testified that, when the appellee made the lease to him, he did not have the means to open or operate mines upon these lands; that the understanding was that he should go ahead, and get other parties to operate them; that he was to represent the appellee and himself in making the subsequent leases; that he decided both for himself and the appellee to whom the subsequent leases should be made, determined the responsibility of the lessees, and fixed the royalties in the leases, subject to the appellee's approval, which was given on his recommendation; and that the appellee had no other agent to represent him in these transactions in Minnesota. In view of this testimony, counsel for the appellant was compelled to, and did, concede that McKinley never became the lessee of the properties, so that he could do with them as he liked, but that the formal lease was a mere instrument, by means of which he was to accomplish the purposes of his agency; and thus we are spared the consideration of this issue. This testimony of the appellant leaves him in this situation: He admits that he was the agent of the appellee holding a lease of his properties, not under a liability to pay the rents reserved therein, but for the sole purpose of selling that lease, or of subletting the property of the appellee described therein, for the mutual benefit of his principal and himself, under a written agreement that he should receive one-fifth of the revenues he might thus obtain from the property of his principal. He admits in his answer and in his testimony that he did obtain large amounts of money and valuable property, by subletting portions of this property, and by selling shares of his apparent leasehold interest therein; and he admits that he refuses to account to his principal for this money and property, and that he insists that it is his own. How, then, does he attempt to escape from the effect of the principles of law to which we have adverted? His claim now is that in consideration that he would expend money and render services in exploring for mineral and in developing or procuring the development of mines upon these lands, and in consideration that he would pay his principal for certain pine timber thereon, the latter orally agreed that he might retain for himself all the profits he acquired, above his one-fifth of the royalties on the ore, at the rate of 30 cents per ton, secured to him by the original lease, and that, in addition to these profits, he should continue to receive this share of the royalties. The appellee meets this claim with a positive denial. He says that he never made any such agreement. This alleged agreement is certainly an extraordinary—an unusual—contract. It is a contract by which a principal who is paying his agent one-fifth of the income of his property in his charge continues his employment and his compensation, and at the same time converts him into an adversary and a speculator in the subject-matter of his agency. An

agent who would enforce such a contract should certainly be required to establish it by very convincing evidence, for experience and observation teach that the interest of owners ordinarily prevents them from entering into contracts with their agents which make them adversely interested in the property intrusted to their care. What, then, is the proof of this contract?

No written agreement to this effect is produced by the appellant, although both parties testify that they carefully reduced to writing and signed the contracts under which they were acting, within 30 days of the time when the appellant testifies that this verbal agreement was made. There is conflicting testimony in the record, but these facts are conclusively established: For 10 years prior to 1891, the appellant acted as the agent of the appellee in Minnesota to explore and buy pine lands for him, and to pay taxes on those he owned in that state. During this time he learned that there was iron ore on some of these lands, and he informed the appellee of that fact, and asked him for an interest in the land, and an opportunity to act as his agent, in exploring, developing the ore upon, and disposing of, it. The result was that the appellee agreed to employ him as his agent for this purpose, and to pay him one-fifth of the revenues derived from the property, on condition that he would explore, develop, and manage the property at his own expense. When they came to put this agreement in writing, McKinley represented to the appellee that he expected to lease the property in question to Carnegie, Phipps & Co., and that he could deal with them to better advantage, and obtain a better lease from them, if he had a formal lease of the property in his own name. Thereupon, for the purpose of enabling him to obtain better rents and terms from those to whom he might assign this lease or sublet any of this property, the appellee made a formal lease of 12 tracts of his land situated in St. Louis county, Minn., hereafter called the twelve 40's, to the appellant, for 20 years, at the rental of 30 cents for every ton of iron ore mined or removed from the land, with a provision that the lessee should pay $4 per 1,000 feet for the pine timber on the leased land on or before July 1, 1892, unless he should have abandoned the land for mining purposes before that time. This lease also contained the provision that it should not be assigned or transferred without the written consent of the lessor. At the same time that this lease was made, these parties made a written contract, in which they recited the lease, and agreed that it was executed upon the express condition that it was to be assigned to these Eastern parties, and that, if it was used for any other purpose without the consent of Williams, such use should work a cancellation of the lease at his option; that he should pay to McKinley one-fifth of the net revenues collected by him under said lease for the full term of 20 years, unless the leased premises were sooner sold, and in that event that he would pay him 10 per cent. of the net proceeds of the sale, and that McKinley would well and faithfully manage the property for the mutual interest of both parties; that he would pay the expense of conducting the business, keep an accurate account of the amount due to Williams from

the royalties or otherwise under the lease, and would save him from any expense that might be, or might have been, incurred in the discovery, exploration, or development of the property preparatory to leasing. As soon as this lease and contract were made, McKinley made an agreement with Alfred Merritt and Leonidas Merritt to lease to them for a term of 20 years three of the 40's in question, for 30 cents per ton of the ore to be mined therefrom (the same rate specified in the formal lease to him), in consideration that they would pay him $10,000 in money and $50,000 in the stock of the Biwabik Mountain Iron Company, a corporation formed by the Merritts to mine this ore, and made the further agreement with them to lease to them all the lands described in the lease to him, if that was found to be necessary. Thereupon, on September 15, 1891, he procured the consent of Williams to his lease of the three 40's of these lands to the Merritts, without informing him of the amount of money and stocks that he was to receive therefor. Two days after, he leased the entire twelve 40's to the Merritts, and on the same day they re-leased all but three of these 40's to the appellant, and paid him $10,000 in cash and $50,000 of the capital stock of the Biwabik Mountain Iron Company, which was then worth $5,000. On the same day, McKinley assigned to one James Billings one-half of his interest in the nine 40's released to him by the Merritts, and Billings gave him his promissory notes for $20,000 therefor. McKinley and Billings then assigned an undivided interest in their rights in these lands to one Humphrey; and about December 1, 1891, they were paid for this assignment $1,000 in cash and capital stock of the par value of $240,000 in the Cincinnati Iron Company, at 10 per cent. of its par value. On December 1, 1891, McKinley leased three of these 40's to the Cincinnati Iron Company for 20 years, for 30 cents per ton of the ore mined thereon, and received capital stock of that company of the par value of $300,000 therefor, which was then worth $30,000. On June 22, 1892, he received $5,000 for his share of the consideration of the assignment of an undivided interest in five of these 40's, which McKinley leased on that day to the Chicago Iron Company for the term of 20 years, for royalties of 30 cents per ton. For this lease he received capital stock of that company of the par value of $333,000, which was then worth $33,300. In this way the appellant secured $15,500 in money, and notes and stocks which were worth, at the time he took them, at least $90,800, making in all $116,-300 in value, which he obtained in less than one year from the date of his contract of agency, by selling interests in, and leases upon, his principal's property. He had not reported, and he has always refused to account for, any of this property; but he did pay to his principal the sum of $720 on account of some pine timber on this land in the month of July, 1892. The appellee did not learn that his agent had received this money and property until long after the items were respectively obtained, and then he learned it by indirection, and not through his agent. McKinley did not report his lease of the twelve 40's to the Merritts, and their re-lease of all but three of these 40's to him in September, 1891, or his sale to Billings, or his leases on December 1, 1891, to the Cincinnati Iron Company; and Wil-

liams did not learn of these transactions until the spring of 1892. When he did learn what his agent had done, the property had been leased to strangers on the faith of his original lease to McKinley, which had been recorded, while his agreement of agency had not been. He accordingly assented to the various leases McKinley had made, and ratified his acts so far as third persons were affected, and then brought this suit against him for the proceeds he had realized from his property.

The facts we have thus far recited are unquestioned, and there is nothing whatever in them to support the theory of the appellant, that his principal had agreed to give him all these proceeds in consideration that he would bear the expense of exploring the lands, and developing the ore in them, preparatory to leasing, and in consideration that he would pay for the pine timber upon them. We turn to the conflicting testimony. The appellee testifies that he never made any such contract, and that he never consented that the appellant should retain any of these proceeds, except stock in one of the companies not exceeding in amount $5,000. He says that, about the time the agreement of agency was made, the question of the amount that McKinley would probably obtain for assigning the lease to Carnegie, Phipps & Co. was discussed, and that the appellee told him that he should not get much of value, but might possibly get $3,000 or $5,000 in value in stock of some company for his personal services; and the appellee says that he consented that, if McKinley did not obtain more than this, he might retain it for himself. To corroborate his testimony, he produces a letter to McKinley in 1891, after it had been determined that Carnegie, Phipps & Co. would not lease the lands, and while McKinley was negotiating with the Merritts, in which he wrote:

"As before and as I still expect it to be with these present parties or any others we may agree with, it was to be conducted for our mutual interests, except, perhaps, a small amount of stock that we are to give you personally for securing the leases."

He testifies that when he consented to the lease of the three 40's, on September 15, 1891, McKinley told him the same story, that he would get but a small amount of stock not exceeding $5,000; and he consented that, if he received no more than that, he might retain it, but told him that this must not be repeated, and that he would not again consent. He testifies that he did not know, and had no notice, that McKinley was to receive any more than this amount. On the other hand, the appellant testifies that this oral agreement, by which he claims more than $100,000 from his principal, was first made in August, before or at about the time when the lease and contract of agency were executed; that it was again made on September 15, 1891, when Williams consented to the lease of the three 40's; that the appellee always assented to his retaining these proceeds as his own, and, to corroborate his testimony, he produces a letter from Williams, dated September 24, 1891, in which he wrote:

"Notice what you say, that you have made lease to the Merritts of the three forties I suppose indicated, to which I gave consent. It was a great favor on my part to divide it without sharing halves with you in the large

bonus they must have paid you. If no other reward, I want you now to protect my interests in all my pine matters, and see that I have a full estimate on these three forties as well as on the balance included in your lease."

And he insists that the fact that the appellee subsequently ratified the leases he had made sustains his theory. These are the salient features of the testimony in this case. The record before us is voluminous, and it would be useless to recite the minor details of the evidence. Enough has been said to show that this alleged agreement, upon which the appellant bases his right to retain this large amount of money and property rests upon conflicting testimony, and is in the teeth of a written agreement between himself and his principal, under which he admits he was acting at the time when he claims it was made. A careful examination of the entire record, in view of these facts, has forced us to the conclusion that the appellant has not established this extraordinary contract, and that his relation to the appellee during all this time continued to be governed by his written agreement of agency made in August, 1891. This conclusion has been forced upon us by these considerations:

First. There can be no valid contract unless the minds of the contracting parties meet, and the proof is conclusive in this record that the minds of this principal and his agent never did meet upon the terms of a contract that gave the entire proceeds of the business of the agency, save four-fifths of the royalties, to the agent. Witness the testimony of the contracting parties and the letters to which we have referred.

Second. There could have been no such contract in August, 1891, at or before the execution of the written contract of agency in that month, because that contract and the lease are conclusive evidence that they contain all the agreements of the parties made at or before they were finally executed, and they were not executed before August 15, 1891. The alleged verbal contract contradicts these written agreements, and cannot prevail against them. "Where the parties have deliberately put their engagements into writing in such terms as to import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties and the manner and extent of their undertaking was reduced to writing." Thompson v. Libby, 34 Minn. 374, 377, 26 N. W. 1; Barnes v. Railway Co., 12 U. S. App. 1, 7, 4 C. C. A. 199, and 54 Fed. 87; McMurphy v. Walker, 20 Minn. 382, 386 (Gil. 334); Harmon v. Harmon, 51 Fed. 113, 115; Wilson v. Cattle Ranch Co., 73 Fed. 994.

Third. If, at any time thereafter, McKinley had made any such contract with his principal, it would have been void, because he never disclosed to him the contracts he had made concerning, or the proceeds he had received through, the subject-matter of his agency. Take the situation on September 15, 1891, when he claims that this contract was made a second time. He had then secured for himself an arrangement for $10,000 in cash and $50,000 in stock of the Biwabik Mountain Iron Company, if he could get the consent of the appellee to the lease of the three 40's to the Merritts. Did he fairly disclose these facts to the appellee before he attempted to make this

alleged contract? The testimony is uncontradicted that he did not. In the expressive vernacular of the appellant, he "didn't give it away." Indeed, this record conclusively proves that he never at any time after he commenced to negotiate with the Merritts, in August, 1891, fairly disclosed his contracts or his transactions or the most material facts relative to this property, to his principal. The arrangement he had made with the Merritts, each of his subsequent contracts and transactions, if known, would have necessarily had a controlling influence upon the action of his principal, in deciding whether or not he would make such a contract as that which the appellant now claims. No agent who conceals or fails to disclose the material facts and circumstances relative to the subject-matter of his agency, that are known to him and unknown to his principal, can make a binding contract with his principal as to that subject-matter to his own advantage. That uberrima fides which the relation of principal and agent demands forbids such contracts, and strips the agent of every benefit which he obtains by such a betrayal of his trust. Warren v. Burt, supra; Wadsworth v. Adams, 138 U. S. 380, 388, 11 Sup. Ct. 303; Brooks v. Martin, 2 Wall. 70; Murray v. Beard, 102 N. Y. 505, 7 N. E. 553.

Fourth. The alleged agreement of the appellant to pay the necessary expense of exploring for ore and developing mines upon this property, preparatory to leasing, and to hold the appellee free from these expenses, constituted no consideration for this alleged contract, because he was bound to do this by the written agreement of agency.

Fifth. The fact that the appellee ratified the acts of the appellant is not inconsistent with the nonexistence of this alleged contract. The principal had the right to confirm the acts of his agent, and to recover four-fifths of the revenues derived from them, if the latter had acted in good faith. His immediate and continuous betrayal of his trust, and his bold and defiant appropriation to his exclusive use of more than $100,000 of these revenues, deprived him of any right to compensation, and gave to the principal the right to recover all the proceeds of his transactions.

Sixth. If we were in doubt as to the existence of this alleged contract, the finding of the court below should prevail. When the court below has considered conflicting evidence, and made its finding and decree thereon, it must be taken to be presumptively correct. Warren v. Burt, 12 U. S. App. 591, 600, 7 C. C. A. 105, 110, and 58 Fed. 101, 106; Paxson v. Brown, 27 U. S. App. 49, 10 C. C. A. 135, 144, and 61 Fed. 874, 883; Stuart v. Hayden, 18 C. C. A. 618, 72 Fed. 402, 408; Fitchett v. Blows, 74 Fed. 47; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355; Evans v. Bank, 141 U.S. 107, 11 Sup. Ct. 885; Furrer v. Ferris, 145 U. S. 132, 134, 12 Sup. Ct. 821.

A single question remains for consideration. It is assigned as error that the court below charged the appellant with the highest market value which the stock he acquired attained, when it should have charged him with the amount which he realized therefrom only. Compensation is the general standard for the measure of damages. It is the actual and proximate loss caused by the wrong for which the plaintiff is entitled to indemnity. Hence the general rule is that

the measure of damages for the failure to deliver property according to the contract, or for its conversion, is the value of the property at the time it was to be delivered, or at the time it was converted. This general rule, however, has been found inadequate to furnish just indemnity for the losses occasioned by the conversion of, or the wrongful failure to deliver, stocks and other properties of like character, the values of which are subject to frequent and wide fluctuations. The general rule gives to the agent, broker, or person in possession of such property, that is really valuable, frequent opportunity to convert it to his own use, at a time when its market price is far below its actual value, and thus offers a prize for the breach of duty, while it often leaves the injured party remediless. To prevent this injustice, and to throw the chance of this loss upon him who inflicts, rather than upon him who suffers, the wrong, an exception has been ingrafted upon this general rule. It is founded upon the proposition that he who deprives another of the possession and control of such property ought to assume the risk of the fluctuations in its market value, until its owner, by purchase or sale, can restore himself to the condition in which he would have been if his property had not been wrongfully taken. It rests upon the proposition that the risk of the market during this time should be assumed by the perpetrator, not by the victim, of the wrong. The exception is that the measure of damages for the failure to sell or to deliver stocks and like speculative property, or for the conversion thereof, is the highest market value which the property attains between the time when the contract required its sale or delivery, or the time of its conversion, and the expiration of a reasonable time, to enable the owner to put himself in statu quo, after notice to him of the failure to comply with the contract, or of the conversion. This measure of damages in such cases has not been universally adopted. There are many and conflicting decisions relative to its form and its justice. But, after a careful consideration of all the authorities and the reasons which justify it, the supreme court adopted it in 1888, and that must conclude the discussion in this court. Galigher v. Jones, 129 U. S. 193, 201, 9 Sup. Ct. 335. Prior to that time, the court of appeals of the state of New York had often discussed and finally had announced this measure. The measure originally adopted in that state was the highest intermediate value between the time of conversion or agreed delivery and the trial. Romaine v. Van Allen, 26 N. Y. 309; Markham v. Jaudon, 41 N. Y. 235. This was subsequently modified to the form in which we have stated the exception, on account of the hardship which the original measure imposed upon the defendant, by subjecting him to the risks of a fluctuating market for years after the injury, where the trial was long delayed. Baker v. Drake, 53 N. Y. 211, 66 N. Y. 518; Gruman v. Smith, 81 N. Y. 25; Wright v. Bank, 110 N. Y. 237, 18 N. E. 79.

Counsel for the appellant argues that this rule should not be applied to this case, because the stocks which the appellant obtained never became the property of the appellee, and hence could not have been converted. The answer is that this measure of damages is as applicable to actions upon contracts as to those upon torts. Barnes

v. Brown, 130 N. Y. 372, 382, 29 N. E. 760; Maynard v. Pease, 99 Mass. 555. Moreover, the reasons for its application to actions for the appropriation, by a trustee, of property impressed with a trust, are peculiarly cogent, and seem to us conclusive. In such cases this measure of damages rests upon the ordinary rule in equity that the trustee shall not put into his own pocket any of the profits arising from the trust. He is bound either to deliver the specific property on the day when the cestui que trust is entitled to its delivery, or to pay him, in lieu of it, the highest market value which it attains between that time and the expiration of a reasonable time after the cestui que trust is notified of the acts of the trustee. Wilson v. Whitaker, 49 Pa. St. 114, 117. In this case the appellant was managing the business and selling the rights of the appellee in this property, as his agent, under a written agreement that no assignment or lease should be made without the written consent of the appellee. Whenever he sold any interest in, or sublet any of, the property of his principal, the latter was entitled to the immediate delivery of the proceeds of the sale or lease. When he took these stocks, his principal was entitled to them, or, at least, to four-fifths of them, as soon as he took them. He not only failed to deliver them to his principal, but he failed to notify him that he had received them at all, until they had passed their highest market value, and until some of them had become worthless. No facts or circumstances occur to us under which the reasons for the application of the measure of highest intermediate value would apply with greater force, or under which they would produce an effect more salutary than under those in the case in hand. The appellant stood in a relation of trust and confidence to the appellee. He failed for months—nay, he refused and still refuses—to deliver to him the stocks which he took in payment for his principal's property. He failed to report the fact that he had them until the time had passed when they could have been sold to the best advantage; so that the appellee was deprived of his best opportunity to sell them, while the appellant secured this chance for himself. In violation of his trust, he took the risk of the fluctuating market. He ought now to pay the damage which the loss of its opportunities may have entailed upon his principal, and which he secured to himself alone by the violation of his trust.

The decree below must be affirmed, with costs; and it is so ordered.