**FRENZER et al. v. FRENZER et al.**

(Circuit Court of Appeals, Eighth Circuit. September 17, 1924.)

No. 6552.

1. **Specific performance ⟨⟩121(7) — Evidence held insufficient to show oral agreement by decedent to devise property to plaintiffs.**

In suit to enforce specific performance of decedent's oral agreement to convey or devise property to plaintiffs, which property they had conveyed to him in consideration thereof, evidence *held* insufficient to establish such agreement by decedent.

2. **Evidence ⟨⟩262, 596(3)—Clear, satisfactory, and convincing evidence necessary to establish oral agreement and admissions by decedent affecting title to realty.**

Testimony relating to oral agreements and admissions of deceased persons, radically changing vested titles and interests in realty, is not of high character, and clear, satisfactory, and convincing evidence is indispensable to sustain such agreements.

3. **Specific performance ⟨⟩121(6)—Situation, acts, and neglects of parties often of more probative value than testimony on issue whether decedent made oral contract.**

Situation, acts, and neglects of parties often rest on conscience of chancellor more persuasively than testimony of witnesses on issue whether deceased person made oral contract.

4. **Evidence ⟨⟩390(1), 397(2) — Preliminary agreements presumed to be embodied in subsequent written contracts or conveyances, and parol evidence generally inadmissible to vary or contradict instrument.**

Agreements and promises in preliminary negotiations are presumed to be embodied in subsequent written contracts and conveyances which are presumed to express parties' entire agreement, and parol evidence is generally inadmissible to contradict or vary such instrument.

Appeal from the District Court of the United States for the District of Nebraska; J. W. Woodrough, Judge.

Suit by Mary C. H. Frenzer and another against Arthur J. Frenzer and others. Decree for defendants, and plaintiffs appeal. Affirmed.

Will H. Thompson, of Omaha, Neb. (Will E. S. Thompson, of Omaha, Neb., on the brief), for appellants.

Carl E. Herring, of Omaha, Neb., for appellees.

Before SANBORN and LEWIS, Circuit Judges, and FARIS, District Judge.

SANBORN, Circuit Judge. This is an appeal from a dismissal after final hearing of a suit by the complainants, Mary C. H. Frenzer and Lucy C. Frenzer, against the defendants, the heirs at law of their brother, John N. Frenzer, who died intestate on August 12, 1921, to enforce specific performance of an alleged agreement of John N. Frenzer, made in August, 1912, to vest in the plaintiffs by deed or will the title to the north 44 feet of the south 66 feet of the west 44 feet of lot 4 in block 105 in the Original City of Omaha, a piece of property which, with the buildings thereon, was of the value of about $40,000.

In their bill the plaintiffs alleged that in 1912 they owned this property; that in consideration of the promise and agreement of

their brother, John N. Frenzer, that he would by will devise and bequeath this property to them, they conveyed it to him on August 19, 1912; that he died intestate on August 12, 1921, and left the defendants his sole heirs at law; and they pray for a decree that these defendants convey to and vest in them the title to this property.

By their answer the defendants denied that John N. Frenzer ever agreed to bequeath and devise this property to the plaintiffs. The case went to final hearing, the court was not convinced by the evidence that John N. Frenzer made the alleged agreement, and for that reason it dismissed the suit, and the first question here is whether in reaching its conclusion any substantial error of law or serious mistake of fact intervened. Coder v. Arts, 152 F. 943, 946, 82 C. C. A. 91, 15 L. R. A. (N. S.) 372.

These facts are admitted or conclusively established by the evidence: Peter Frenzer died testate seized of the stores known as the Frenzer Block and the land on which it stood, which was 132 feet in length from north to south, and 44 feet in width from east to west. He died, leaving surviving him two sons, John N. Frenzer and Joseph P. Frenzer, and two daughters, Mary C. H. Frenzer and Lucy C. Frenzer. By his will he devised the north half of this block to Joseph P. Frenzer, the south 22 feet to John N. Frenzer, and the north 44 feet of the south half to Mary C. H. Frenzer and Lucy C. Frenzer. His will was filed with the proper county court, an application was made for its probate and on August 20, 1912, it was by decree of that court admitted to probate as the last will of Peter Frenzer.

The agreement which the complainants sought to establish was an oral agreement. The deed, which they alleged was made in consideration of this oral agreement of John N. Frenzer to cause by his will or deed their 44 feet of the Frenzer Block to revert to them if he died before either of them, was a plain quitclaim deed made on August 19, 1912, by Joseph P. Frenzer, Mary C. H. Frenzer, and Lucy C. Frenzer, of the south half of the Frenzer Block. It expressed a consideration of $2. It was one of four deeds made at that time in executing an amicable division of the property of which Peter Frenzer died seised between his four children and heirs at law.

[1] Prior to the execution of these deeds there were negotiations between John N. Frenzer and Joseph, Mary, and Lucy Frenzer about this division. The material evidence relative to the alleged oral agreement of John N. Frenzer follows: On July 20, 1912, he wrote a letter to Mr. Will H. Thompson, which contained this statement, "My sisters are willing to convey to me the 44x44 they obtained north of and adjoining the property willed to me, but they want a restriction that in case of my death the property is to revert back to them, thus cutting out my three children. I will not agree to this, but want a proper conveyance, without any restrictions or limitations." Joseph P. Frenzer and Lucy C. Frenzer were the executor and executrix, respectively, of the will of Peter Frenzer.

Joseph P. Frenzer testified that, in negotiating the amicable division of the property of their father, he acted as an intermediary between his brother John and his sisters; that he had many conversations with John about it; that he told John that he would try to get the sisters to deed the property here in controversy to him, "provided John would agree that the property would revert back by will or deed to the sisters, or either of them, at the time of his death"; that everything hinged on this agreement; that in his last conversation with John, a day or two before August 19, 1912, when the deeds were made, he said to John, "Have you finally decided?" John replied, "I will do as you want me to; I don't want to, but I will;" and Joseph told him, "I will have the girls sign a quitclaim deed, provided you will do as I want you to;" that he told the younger sister that he had "made an arrangement with John that we were to give him a quitclaim deed, and he in turn would agree to have the property revert back to them, should he die before either of them did." Joseph also testified that the other deeds were executed at the same time with this one; that their execution was a part of the same agreement; that John and the two sisters were to (and they did) execute a deed to Joseph, and John and Joseph were to (and they did) execute a deed to the two sisters; and that the drawing of these deeds "was left to brother John, as he was a lawyer and they had every confidence in him, and they left this matter and all other matters of this kind to him." He further testified that after the death of John in 1921 he had several conversations with Arthur J. Frenzer, the son of John, and told him that his father's sisters had deeded part of their property to his father, with the provision that it was to be deeded or willed back to them, and Arthur answered that he knew that. Virginia Frenzer, the daughter of Joseph, tes-

tified to overhearing. a similar conversation between Arthur and her father, and Arthur testified that no such conversation with him ever took place, and that he never had any knowledge or information of any agreement that his father had made to will or turn back any portion of the Frenzer Block to the complainants.

Mrs. Mathieu testified that in September, 1912, at her house, John N. Frenzer told her that he had lots of trouble with his brother and sisters, because his father did not give him as much as he gave his brother Joe; that she asked him how he came to settle, and he said. "The girls gave me a quitclaim deed for the stores that they were to have, and it is all right now. I am equal to Joe; only when I die that is to go back to my sisters. But I have to pay them so much a month for the use of the stores."

John N. Frenzer went into the possession of the stores on the 44 feet in controversy under the deed of the plaintiffs to him of August 19, 1912. He collected $3,000 to $4,000 a year rent from the property from that time until he died in 1921. He never paid his sisters anything on account of his possession or use of these stores, and there is no evidence that any claim was ever made upon him during his lifetime for a deed or devise of them to the complainants. All the evidence relative to the question, Did John N. Frenzer make an agreement to devise or deed back to his sisters the property they deeded to him on August 19, 1912? has now been recited.

Counsel for the complainants assert that the testimony of Joseph P. Frenzer that John consented to make such an agreement. the testimony of Mrs. Mathieu that John told her the property was to go back to the complainants when he died, but he would have to ·pay them so much a month for the use of the stores, and the contradicted testimony of Joseph and his daughter Virginia that the defendant Arthur J. Frenzer said after his father's death that he knew that part of his father's property was to be deeded back to his father's sisters after his death, clearly and conclusively prove the alleged oral contract, because no witness was present at the alleged conversation between Joseph and his dead brother upon which the claim of the oral agreement is based, and therefore none has come to deny it. But the time when, according to the testimony of Joseph P. Frenzer, John N. Frenzer agreed to vest in the complainants by deed or will the title to the property in question, upon the contingency that he should die

before they did, and the time when, according to the testimony of Mrs. Mathieu, he admitted to her that this property was to go back to his sisters, that he had to pay them so much a month for the use of the stores, was more than eight years before these witnesses testified, and more than eight years before John died. He did not pay the complainants anything for the use of this property during those years. He did not vest or attempt to vest, and no one ever asked or suggested to him during this time to vest, the title to this real estate in these sisters by deed or devise on the contingency that he should die before they did.

[2] The testimony of the living to oral agreements and admissions of the dead, which radically change the recorded titles and interests in real estate of deceased persons and of their heirs or devisees, is not of a high character, and reliance should be placed upon it with great caution. Especially is this true where many years have intervened between the times of the alleged making of such agreements and admissions and the death of the party or parties whose titles or interests are assailed by such testimony. Clear, satisfactory, and convincing evidence is indispensable to sustain an oral agreement of a deceased person to convey, charge, or change his title or interest in real estate. A meeting of the minds of the parties to such an agreement upon the same terms at the same time must be clearly shown.

The evidence in these respects in this case is not entirely satisfactory. Joseph P. Frenzer testified as to the terms of the oral agreement, that he was acting for himself on his own volition as intermediary between John and his sisters, that they did not leave the matter to him, that he had no right to do what he did do, that he thought it was only fair and just that John should get half of the block, the same as he got half of the block; that his sisters did not act, except upon his advice or suggestions; that he was "conducting these negotiations for the purpose of John N. Frenzer obtaining this deed"; and that he acted altogether with John. As to the terms of the agreement and the meeting of the minds of the sisters and John upon them, he testified: That he told John he would intercede for him, and try to get the sisters to deed the property to him, if he would agree that it would revert back by will or deed; that John never consented to these terms until his last conversation with him; and that this conversation was that he (Joseph) said

to him, "Have you finally decided?" He replied he might as well come to it. "I will do as you want me to; I don't want to, but I will"; and Joseph told him, "I will have the girls sign a quitclaim deed, provided you will do as I want you to." There is evidence that the sisters made the quitclaim deed to John as required by Joseph, but no evidence that Joseph ever in John's lifetime asked or wanted him to vest the title to this property in the sisters upon the contingency that he died before they did. Asked what he said to his sisters after this last conversation with John, Joseph testified as follows:

"I asked sisters if they didn't think it would be the proper thing for them to deed that property over to my brother, so as to equalize things, which they thought only fair, and which they very willingly done.

"Q. You told them what agreement you had made. What did you tell them as to the agreement you had with John when you told them to sign the deed? A. I told the younger one—the younger sister, as she was the executor with me—just what the agreement was."

A search of the record discloses no evidence that the complainant Mary C. H. Frenzer was ever informed, before she signed her quitclaim deed, of any agreement by John to vest the title to any of the property in her and her sister upon the contingency that he died before they did. She may have signed the deed, according to the testimony, and perhaps her sister did also, in consideration of the moving plea of Joseph that it was the proper thing for them to do, "so as to equalize things" between the two brothers, and not in consideration of the alleged oral agreement. Mrs. Mathieu testified that John told her that the property was to go back to the sisters and he was to pay monthly for the use of it. This evidence leaves a grave doubt whether, if there ever was an oral agreement by John as the complainants claim, the minds of the parties to the oral agreement ever met upon any definite terms of it at the same time.

[3] There are other and more serious obstacles to a decree of specific performance of this oral agreement. The situation and circumstances, the acts and neglects of parties, often rest upon the conscience of a chancellor with more persuasive and compelling force, upon the issue of contract or no contract between them, than the testimony of witnesses upon the direct issue. The former are often established beyond the shadow of a doubt, while the latter, as in this case, may rest upon the failing and uncertain testimony of man after his mind has been intent upon other subjects for many years.

If the oral agreement to which Joseph P. Frenzer testified was ever made, it was made in and was a part of the preliminary negotiations for the amicable division of the property, which descended to the four heirs of Peter Frenzer, and that negotiation resulted in the amicable division evidenced by the four deeds, which were made a day or two after the final conversation in which Joseph testified the oral agreement between John and his sisters was made. He testified that everything depended upon that agreement; that at the close of that conversation "he told John to draw up the papers and that he would have his sisters sign them"; and that "the drawing of these was left to brother John, as he was a lawyer, and they had every confidence in him, and they left this matter and all other matters of this kind to him." John drew the papers, among them the quitclaim deed of Joseph and the two sisters of the property here in question, and some of Joseph's property to John, and the quitclaim deed of Joseph and John of some of their property to the two sisters.

[4] Familiar general rules of law are that all agreements, promises, and conversations in the preliminary negotiations for subsequent written contracts and conveyances are presumed to be embodied in them; that parol evidence is generally inadmissible to contradict or vary such contracts or conveyances; and that such contracts or conveyances are presumed to express the entire engagement of the parties and the manner and extent of their undertakings. Green v. Chicago & N. W. Ry. Co., 92 F. 873, 877, 35 C. C. A. 68; McKinley v. Williams, 74 F. 94, 101, 20 C. C. A. 312; Thompson v. Libby, 34 Minn. 374, 377, 26 N. W. 1; Wilson v. Ranch Co., 73 F. 994, 999, 20 C. C. A. 241; Davis Calyx Drill Co. v. Mallory, 137 F. 332, 338, 69 C. C. A. 662, 69 L. R. A. 973.

Conceding for the purposes of consideration of the issue, oral contract or none, that in this case parol evidence of such a contract is admissible, it is very remarkable that it was not embodied in one of these deeds. It was the most important agreement considered in the preliminary negotiations, which seem to have continued for weeks. It was competent and proper to express the terms and effect of such an oral agreement in the deed by the sisters to John, or in the deed from Joseph and John to the sisters. Indeed, that was the natural and reasonable

place for it, if it had ever existed, the place where a competent lawyer or conveyancer, who was aware of such an agreement made in the preliminary negotiations for the deeds, unquestionably would have placed it. John N. Frenzer was a lawyer, he was a brother of the complainants, he was intrusted by them with the duty of drawing the papers according to their agreements, and he knew he was acting in a confidential relation in discharging a trust accepted by him in preparing them, and it is more incredible that he violated his trust and the confidence reposed in him than it is that Joseph may have been mistaken in his belief, or in his testimony that John ever understood that he agreed by will or deed to turn back the property here in controversy to the complainants, if he died before they did. All John's acts are inconsistent with any such agreement. The complainants' claim is that their deed was made in consideration of that agreement. If so, that fact would naturally and rationally have been expressed in their deed; but the deed recites a consideration of $2 and nowhere refers to such an agreement. Joseph and the two sisters signed that deed; it was their duty to read it, and the legal presumption is that they did so. If there had been such an oral agreement made in the negotiations for the amicable division, the sisters of Joseph, who signed the deed with them, would properly and rightfully have insisted upon the insertion of the terms of that agreement, or a reservation embodying its effect, in that deed before they signed it.

When the situation and circumstances of John N. Frenzer and his sisters in August, 1912, when the deed was made, the fact that the oral contract which the complainants claim, if it was ever made by John, was made in the preliminary negotiations for the amicable division of the property of their father, which were embodied in subsequent deeds affecting that division, that John was a lawyer, the brother to the other parties to the negotiations, in whom they trusted, and to whom they delegated the duty of drawing the papers evidencing their division and distribution of the property between them, that, according to the testimony of complainants' main witness, the claimed oral agreement was the most important thing in their entire negotiations, that John N. Frenzer drew the deeds resulting from the negotiations and embodying the result thereof, and never inserted therein that oral agreement or its effect, that all the parties read and signed the deeds without objection,

and that the acts of all the parties from the time those deeds were made in 1912 until after the death of John N. Frenzer, more than eight years later, were consistent with the absence of any such agreement are thoughtfully considered, the testimony of the witnesses for the complainants to the existence thereof is neither preponderant, satisfactory, or convincing, and the decree below is affirmed.