## HAMPTON v. OKLAHOMA CITY.

No. 20286. Opinion Filed Nov. 15, 1932.

Motion to Recall    Opinion Denied
Jan. 3, 1933.

Twyford & Smith and G. Lee Gibbs, for plaintiff in error.

W. H. Brown, M. W. McKenzie, Municipal Counselors, and Bliss Kelly and A. L. Hull, Asst. Municipal Counselors, for defendant in error.

KORNEGAY, J. This is an action brought by the plaintiff in error on September 27, 1923, under a tax title against a great number of defendants in the city of Oklahoma City, the defendants being either the owners of lots, or heirs of owners, or trustees of owners of property in Shaw's Heights addition to Oklahoma City, the property in controversy being lot No. 20, the term lot and block being used interchangeably in the proceeding. It is averred in the petition that the plaintiff, since July 31, 1919, had been the owner and in possession of the property, and the defendants named constitute "all of the owners of and residents in Shaw's Heights addition to Oklahoma City, which is also known as the northeast

quarter of section 17, twp. 12 N., R. 3 W.," and the prayer is to require all of the defendants to set up their title to the property, and to bar all of them, and their heirs, trustees, assigns, successors, administrators and executors from any interest in the property.

It appears that service was had, or acknowledgment made of service, on practically all of the defendants, and the controversy narrowed to a suit between the plaintiff and the city of Oklahoma City over the property, which had been improved by street pavement at the expense of the taxpayers of Oklahoma City, and, as claimed by the authorities thereof, it belonged to the city as a park, and undisturbed and undisputed possession for 15 years was pleaded, and averment made that it was not subject to sale for taxes. Trial was had by the court beginning March 5, 1928. The tax deeds were offered, one being dated the 29th of January, 1922, and styled "resale tax deed." The other was dated July 15, 1919, and styled "tax deed." There were conveyances from the purchaser to the plaintiff, Hampton.

On behalf of Oklahoma City, there was exhibited the dedication contained in the plats made by the original owners when Shaw's Heights was laid off into town lots, as well as testimony as to the claims of the owners, and the action of the owner in dealing with the property thereafter. It was platted as "Shaw's Heights, adjoining Oklahoma City." The surveyor's certificate was dated the 15th of November, 1906, and the instrument of dedication is dated the 19th of October, 1906, and block No. 20, as shown in the attached plat, is "hereby dedicated to the residents of Shaw's Heights for use as a park forever." This dedication was acknowledged and placed of record in the year 1906, and the map accompanying the dedication shows that block No. 20 was designated as a park.

A good deal of testimony was taken as to the action of the city with reference to it, and its acceptance of the same, and the improving the same, and the report of the landscape architect dated February 1, 1910, was also offered, reciting that Shaw's Heights park, containing five acres, had recently been donated to the park commission.

The case was tried by the court, and at its conclusion, and after argument, the court on the 20th of March, 1928, decided the matter, and the journal entry of judgment is as follows:

"The court finds that Israel P. Shaw, the original owner of the property known as Shaw's Heighths addition, adjoining Oklahoma City, together with all of the other persons then owning lots and blocks in said addition, adjoining Oklahoma City, on or about the 1st day of November, 1906, made and executed a certain plat, dedication and certificate covering said Shaw's Height addition, adjoining Oklahoma City, which said plat, dedication and certificate was filed for record with the county clerk, then register of deeds, of Oklahoma county, Oklahoma, on November 16, 1906. That lot 20 in said addition was marked on the plat with the word 'Park,' and that the dedication and certificate attached thereto and a part thereof, and filed therewith, in part, reads as follows, to wit:

"'We hereby dedicate to the public forever the streets as shown on the attached map or plat and do hereby provide that any and all conveyances hereafter made of any tracts or parcels of the land owned by us shall be made subject to this dedication of such streets. Block numbered 20 as shown on the attached plat is hereby dedicated to the residents of Shaw's Heights for use as a park forever.'

"That the plaintiff's alleged title to said property rests upon a certain tax deed executed July 15, 1919, in favor of F. H. Wellcome, and recorded on July 31, 1919, and which was afterwards acquired by plaintiff, and in addition thereto, a certain resale tax deed issued to Clarence E. Trosper on January 29, 1922, and filed for record August 10, 1922, which was afterwards acquired by plaintiff.

"The court further finds that said Shaw's Heights addition was outside of the corporate limits of the city of Oklahoma City in 1906, and was taken into the corporate limits of said city in about the year 1909 or 1910.

"The court further finds that said plat, dedication and certificate operated to vest the title to said lot 20 in Shaw's Heights addition adjoining Oklahoma City, in the city of Oklahoma City, a municipal corporation, to be held by it in trust for the public as a public park forever. That thereby the said legal title to said property became vested in said city of Oklahoma City, a municipal corporation, as aforesaid, which is its only muniment of title, and that thereby the same became and remained nontaxable, and that by reason thereof the said tax deeds held by plaintiff and his grantors, failed to convey any title to said plaintiff or said grantors.

"Now, Therefore, it is hereby considered, ordered, adjudged and decreed that plaintiff take nothing herein; that the title to the said lot 20 in Shaw's Heights addition, Oklahoma City, Oklahoma county, Oklahoma, is hereby vested and confirmed in said defendant, the city of Oklahoma City, a munic-

ipal corporation, and its title thereto is hereby fully quieted and perfected as against said plaintiff and all persons claiming under him, and the city is hereby given judgment for its costs expended, to which order and judgment the plaintiff excepted, and his exceptions allowed.

"T. G. Chambers, Judge."

Motion for judgment for the plaintiff notwithstanding the other findings, and motion for new trial, were made and overruled. The briefs that have been filed by the respective parties are very voluminous, and a great many cases are cited and discussed, the range being from Boston Commons to the quays of New Orleans, and across the continental divide to the Pacific slope, and reaching from the Gulf to the Lakes in location.

Among other cases are some cases decided by the Supreme Court of Oklahoma under the Oklahoma statutes and concerning the general principles of dedication, as well as a great many other cases from other courts under other statutes, common-law rulings, there being intermingled, amongst the others, cases decided by the Supreme Court of the United States, subordinate federal court decisions, and several from the courts of last resort in the various states.

Two briefs have been filed on behalf of the defendant in error, one by the former municipal counsel and another by the present municipal counsel. An original brief was filed by the losing party below, John P. Hampton, and a supplemental and reply brief has been filed and near its close the following statement is made:

"The only cases cited by either side squarely and exactly in point are those of

"Gund Realty Co. v. City of Cleveland (Ohio) 160 N. E. 101;

"Town of Hooker v. Morris, 92 Okla. 194, 218 P. 869;

"City of Eugene v. Lowell, 72 Ore. 237, 143 P. 903.

"The Ohio case is the latest and most clearly reasoned.

"There can be no escape from the logic of these three cases."

An examination of those cases does not indicate that the facts therein were identical with the facts in this case, and scarcely comparable. In fact they appear to be rather different. At page 87 of the brief, referring to adversary citation, we find the following:

"The reason for citing the case of Davenport v. Buffington, 1 Ind. Ter. 424, 45 S. W. 128, at page 37 of the brief, is not apparent.

There the promoters of the town divided the land into 'streets, avenues, alleys, blocks, lots and public parks' and they made a map showing the streets and public parks and sold lots on the strength of the map. That the two towns in question took possession and for 23 years exercised uncontrolled and undisputed possession, ownership and control of the parks and improved the same. The first paragraph of the syllabus reads:

" 'Where land has been dedicated by the promoters of a town site for a public park, and the town "directs the same to be sold, a taxpayer may maintain injunction." '

"Here none of these features were present. The property was not in any town or city nor was it an addition to any town or city. No public park was dedicated nor was any such taken possession of or improved. No lots were sold on the strength of this being a public park. They were sold on the strength of block 20, being individual (not public) property."

An examination of the authority there cited is strongly indicative of the fact that there was some confusion in the mind of the court as to the history of the park there involved. However, the case went to the Circuit Court of Appeals for the 8th Circuit on appeal from the higher court of the Indian Territory, and was decided by that court, Judges Sanborn, Caldwell, and Thayer, circuit judges composing it. 97 Fed. 234. In an opinion by Judge Sanborn, the history of the litigation is given. The park in question, as shown therein, was designated on a plat, as prepared by the town commissioners of the Cherokee Nation in 1871, and lots sold, followed by the incorporation of Downingville, and later the Cherokee Nation sought to revoke the dedication therein made and to sell the property for business purposes. At the time this happened, jurisdiction of the matter, as applied to Cherokee citizens, was confined to the Cherokee courts, but a white man came along by the name of Tarrant, and became a resident of the town, and his rights in the matter being involved was the only thing that gave the federal court jurisdiction of the case, and he was joined with certain citizens of the Cherokee Nation in the injunction proceeding.

Three courts affirmed the idea that Tarrant, a noncitizen, who at that time under the statutes regulating intercourse with the tribes was forbidden to acquire any interest in the land, and was allowed to come and go across the park as one of the general public, had sufficient interest to give jurisdiction to the federal court to protect. The opinion of Judge Sanborn in that case about as fairly illustrates the law on the subject of trusteeship of property dedicated

for public use for park purposes as any of the cases that have been called to our attention. After stating the facts and the relationship of the parties to the cause of action, at page 235 of the 97th Federal Reporter, the court says:

"When this suit was commenced the tribal courts of the Cherokee Nation had exclusive jurisdiction of all cases arising in the Cherokee country, in which members of that tribe by nativity or adoptions were the only parties, while the United States court in the Indian Territory had jurisdiction of every civil case arising between a citizen of the United States and any citizen or person residing in the Indian Territory. 25 Stat. 784, c. 333, par. 6; 26 Stat. 94, 96, c. 182, sections 29, 31; Raymond v. Raymond, 28 C. C. A. 38, 83 Fed. 721, 723. All the parties to this suit except Tarrant were members of the Cherokee Nation. If Tarrant had no cause of action against the appellant, then he was not a proper party to this suit, and the United States court was without jurisdiction of it. The defect of parties plaintiff which the appellant urges upon our consideration is that Tarrant was a mere general taxpayer and resident of Downingville, that he had no interest in the preservation of its parks different from or other than that possessed by every other resident taxpayer, and that this was insufficient to enable him to maintain a suit for this injunction. If, however, these parks were dedicated to the public by the Cherokee Nation, as this taxpayer claims, that dedication was made more than 25 years ago, and the town of Downingville has been settled, the lots in it have been sold, and its inhabitants have established their homes there, and have become the taxpayers of the town in reliance upon that dedication. After all this has been done, the nation sells the parks, and its vendee enters upon a portion of one of them, and is about to appropriate it to his private use, and to make it the site for his residence. Has a resident and taxpayer of the municipality no remedy for such a wrong? May the parks which he and his fellow citizens have paid to improve be sold and appropriated to the use of the nation, or of strangers, while he stands by remediless? Has he no interest in the right of the public to the free use of these commons sufficient to enable him to maintain a suit in equity to prevent the destruction of his right to use them, the spoliation of the parks, and their appropriation to private use? Let us see. The title to the land in these parks, subject to the right of the inhabitants and taxpayers of the town to use it forever for park purposes, is without value. It is nothing but a naked legal title held in trust for the people who use, or have the right to use, the parks. The real value of the land in the parks is the value of the right to use it, and when the nation sells the parks it derives its purchase price, in fact, not from the sale of the title to the land, but from the sale or the destruction of the right of the people to use that land for park purposes. Thus, by the sale of the parks, the resident taxpayer, Tarrant, is deprived of his share in the valuable right to use them. This is not the only injury entailed upon him by this sale. Parks are, if not necessary, at least customary, possessions of towns and cities; and, if the parks of Downingville are sold and appropriated to private use, the strong probability is that the town will purchase more land, establish other parks upon it in lieu of those destroyed, and thus increase the burden of the appellee's taxation. Again, Tarrant alleges that he has a wife and four children, and that he expects to make Downingville his home, and to raise and educate his children there. If these parks are appropriated to private use, he and his family will be deprived of their use to promote their health, recreation, and amusement. In short, the sale of the parks, and their use by the vendees for their private purposes, will deprive the appellee Tarrant of his share in the valuable right of the people to use them for park purposes, will deprive him and his family of a source of health, recreation, and amusement, and will be very likely to increase the burden of his taxation by compelling him to pay a part of the purchase price of other parks bought to replace those destroyed. Now, the enforcement of trusts is one of the great heads of equity jurisdiction. The land in these parks, if it was really dedicated to the use of the public for park purposes, is held in trust for that use, and courts of equity always interfere at the suit of a cestui que trust or a cestui que use to prohibit a violation of the trust, or a destruction of the right of user. The appellee Tarrant is one of the cestuis que use for whom these parks are held in trust, and the inevitable conclusion is that his interest in them is ample to enable him to maintain a suit in equity to prevent their diversion to private uses."

Further along the court says:

"The second proposition of counsel for the appellant is that the complaint states no cause of action, because the Cherokee Nation had the right to revoke in 1896 the dedication which it made in 1871, and to sell the land dedicated to public parks free from the trust with which it was impressed. The designation of this land as parks or commons on the plat of the town of Downingville, which was accepted and approved by the nation in 1871, was, in legal effect, a grant of the land for the exclusive use of the public for park purposes, and a warranty on the part of the nation, which owned it, that it would never claim or use lots in accordance with this plat by the init for any other purpose. The purchase of

habitants and taxpayers of Downingville, and their imposition upon themselves and their expenditure of taxes to care for and improve the parks was an acceptance of this grant and covenant. Bell v. Railroad Co., 63 Fed. 417, 419, 11 C. C. A. 271, 272, and 27 U. S. App. 305, 308; Beatty v. Kurtz, 2 Pet. 565, 583; City of Jacksonville v. Jacksonville Ry. Co., 67 Ill. 540, 542; Le Clercq v. Trustees of Gallipolis, 7 Ohio 218, 221, pt. 1; Village of Princeville v. Auten, 77 Ill. 325, 330; Brown v. Manning, 6 Ohio 298. After the mayor and town council of the town of Downingville was incorporated by the Cherokee Nation, and after it took possession and control of these parks, this grant and acceptance became a three fold contract. It was an agreement between the nation and the public,—the people for whose use the title of the parks was held,—an agreement between the mayor and the town council of the town of Downingville and these people, and an agreement between the nation and the municipality; and all parties to this agreement were equally bound to hold and keep the land embraced within these parks sacred to the exclusive use of the public for park purposes. It is not claimed that a private proprietor, who had platted and dedicated land for a park in this way, could lawfully revoke that dedication, and sell the park for private use, after lots had been bought, and the park had been improved in reliance upon the plat. The contention is that the Cherokee Nation was a trustee for and represented the public, and that its sale of the parks was a lawful release of the right of the public to use them as such by their legal trustee and representative. In support of this view counsel for the appellant cites Clarke v. City of Providence (R. I.) 15 Atl. 765, 766, and Commissioners v. Armstrong, 45 N. Y. 234. In these cases, however, the state simply authorized the municipalities to appropriate the parks within their limts to other uses. The state did not assume in either case to appropriate a park to its own use, or to sell it for its own benefit, as the Cherokee Nation does in the case at bar; so that these decisions do not rule this case. Moreover, the nation, in the case in hand, is the grantor and convenantor, and upon indisputable principles it cannot be at the same time the grantee and the convenantee, or the agent of such grantee and convenantee, to release to itself the grant and covenant which it has made. McKinley v. Williams, 74 Fed. 94, 95, 20 C. C. A. 312, 313, and 36 U. S. App. 749, 752, and cases there cited. Besides, we are unwilling to concede that a nation or a state which becomes the proprietor of a town site, plats it, and dedicates its streets and parks to public use, has any greater or better right to revoke or avoid its grant or covenant than a private proprietor would have. It may be that either, before any rights have accrued, can revoke the dedication, but, after lots have been sold, after streets have been graded, after parks have been cared for and improved according to the plat.—in other words, after rights have vested in reliance upon the dedication,— we deny the right of nation or of individual to revoke it, or to release or destroy the right of the public to the exclusive use of the parks and streets for the purposes for which they were granted."

This case affirms the idea that the "Cy Pres" doctrine of courts of equity, as applied to public donation, is broad enough to embrace even the "forbidden man" who joins in community welfare by residence and governmental support. Equally strong in argument and convincing in reason is the case of The President, Recorder and Trustees of the City of Cincinnati v. The Lessee of Edward White, 6 Peters, 431. 8 L. Ed. 452. Quotation therefrom is not deemed necessary, as the quotation from this decision concerning the "park" in the "old home town" of several parties who have had relations with this court appear to cover the case. The case of State ex rel. Commissioners of Land Office v. Galyon, 154 Okla. 204, 7 P. (2d) 484, decided by this court January 19, 1932, appears to be decisive of the question here involved on the question of the validity of the tax deeds to convey the property here involved.

As applied to the evidence in this case, it is clear thereunder that the original owner of this property dedicated it to the public for use as a park by virtue of platting the property and selling lots to the public indiscriminately, and that whether or not Oklahoma City was in existence at the time of this dedication would be immaterial, as the property had been dedicated to the public for use, and it is further clear that the dedication as made was not a reservation, but was for the benefit of those having occasion to deal with the land or the inhabitants of the land laid off and platted as a town, no matter who they might be, whether real estate proprietors, renters, or transients. The decision of the court below, holding that it was public property and not subject to sale for taxes, is sustained by the evidence and appears to follow the law.

The case is accordingly affirmed.

LESTER, C. J., CLARK, V. C. J., and HEFNER, CULLISON, SWINDALL, ANDREWS, and McNEILL, JJ., concur. RILEY, J., concurs in conclusion.