# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DIAMOND FORTRESS TECHNOLOGIES, INC., and CHARLES HATCHER, II, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) ) | C.A. No. N21C-05-048 PRW CCLD |
| EVERID, INC., | ) ) ) | |
| Defendant. | ) | |

Submitted: January 18, 2022
Decided: April 14, 2022

## OPINION AND ORDER

*Upon Plaintiffs Diamond Fortress Technologies, Inc., and
Charles Hatcher, II's Motion for Default Judgment,*
**GRANTED.**

Kurt M. Heyman, Esquire, Heyman Enerio Gattuso & Hirzel, Wilmington, Delaware; Walter A. Dodgen, Esquire, Zachary P. Mardis, Esquire, Maynard, Cooper & Gale, PC, Huntsville, Alabama. *Attorneys for Plaintiffs Diamond Fortress Technologies, Inc., and Charles Hatcher, II.*

United States Corporation Agents, Inc., Middletown, Delaware. *Registered Agent for Defendant EverID, Inc.*

**WALLACE, J.**

This breach-of-contract action arises out of Defendant EverID, Inc.'s failure to compensate the Plaintiffs, Diamond Fortress Technologies, Inc. and its CEO Charles Hatcher, II, for their combined assistance in developing EverID's cryptocurrency trading platform and mobile application.

For an exclusive license to use Diamond Fortress's proprietary biometric software, EverID offered to remunerate the Plaintiffs via cryptocurrency token distributions. The promised distributions were to occur upon the Initial Coin Offering ("ICO") of "ID Tokens," EverID's newly created cryptocurrency, and upon subsequent Token Distribution Events ("TDEs"). The ICO and several TDEs came and went without Plaintiffs receiving a single token. No surprise, they then sued EverID.

EverID has never responded, appeared, or otherwise defended itself in any manner in this lawsuit. So the Plaintiffs filed a default judgment motion that the Court granted in part—the Court found the breach but paused on the damages. The Court conducted a subsequent hearing on the Plaintiffs' purported economic damages that centered on just what might be the appropriate methodology and value source for reckoning a damages judgment. The classification and valuation of cryptocurrency, as well as the calculation of damages resulting from the breach of a cryptocurrency-paid contract are novel matters to Delaware.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.  THE PARTIES

Diamond Fortress is a biometric software company.[2]  Mr. Hatcher is Diamond Fortress's CEO—one with extensive experience in the global market of biometric authentication and identity platform architecture.[3]

Diamond Fortress developed a patented software named "ONYX."[4]  ONYX is a secure, touchless fingerprint-identification software application that utilizes the camera on mobile devices, *e.g.*, smartphones, to detect and verify user identities by fingerprint recognition.[5]  Third parties can integrate the ONYX software into their own platforms by purchasing a license and software development kit.[6]  Mr. Hatcher

---

[1]  The factual recitation of events discussed herein is wholly based on the Plaintiffs' submissions. *See Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586 (Del. 2008) ("The effect of a default in answering [ ] is to deem admitted all the well-pleaded facts in the complaint."); *id.* at 587 ("'[A] default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover . . . Although he may not challenge the sufficiency of the evidence . . . .'") (quoting *Nishimatsu Const. Co., Ltd. v. Houston Nat. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)); *see also Cigna Worldwide Ins. Co. v. Elegant Inc.*, 2002 WL 1402348, at *2 (D. Del. June 25, 2002) ("Once the default [judgment] has been entered, the well-pleaded facts of the complaint must be accepted as true.").

[2]  Compl. ¶¶ 4, 10, *Diamond Fortress Technologies, Inc. v. EverID, Inc.*, N21C-05-048 PRW CCLD, May 4, 2021 (D.I. 1).

[3]  *Id.* ¶¶ 1, 21.

[4]  *Id.* ¶ 10.

[5]  *Id.*

[6]  *Id.*

is often hired as an advisor by those buyers to assist with the ONYX software integration and the management of its use thereafter.[7]

EverID, an entity active in the blockchain and cryptocurrency industry, is a corporation organized under Delaware law that maintains its principal office in Poway, California.[8] It created the cryptocurrency "ID Tokens."[9] As a component of ID Tokens, EverID also developed a blockchain-based identity and financial platform but needed the means to verify and confirm its users' identities.[10]

## B. THE LICENSE AND ADVISOR AGREEMENTS

In or around September of 2017, the parties conferred about integrating the ONYX software into EverID's then-developing cryptocurrency enterprise.[11]

In addition to integrating the ONYX software into its platform, EverID made other demands. First, it requested Mr. Hatcher serve as an advisor and mentor for the integration and duration of its use of ONYX.[12] Second, it required Diamond Fortress to grant EverID an exclusive license to ONYX for digital or blockchain

---

[7]   *Id.* ¶¶ 1, 12.

[8]   *Id.* ¶ 6.

[9]   *Id.* ¶ 11.

[10]   *Id.*

[11]   *Id.*

[12]   *Id.* ¶ 21.

wallets; that required Diamond Fortress to halt its then-active endeavors soliciting other opportunities in the blockchain industry.[13] For the award of EverID's exclusive ONYX software license, Diamond Fortress and Mr. Hatcher agreed to be compensated in EverID's ID Tokens when EverID eventually held its ICO (the cryptocurrency equivalent of an initial public offering[14]) and subsequent TDEs.[15] The periodic token distributions were to be the means of satisfying EverID's payment obligation in lieu of Diamond Fortress's standard payment requirement of quarterly license "Run-Time Transaction Fees."[16]

Diamond Fortress and Mr. Hatcher agreed to EverID's demands, and the respective License and Advisor Agreements (together "Agreements") negotiations commenced.[17] While the Agreement negotiations were underway, Plaintiffs granted EverID a software license key to immediately begin its integration and use of

---

[13] *Id.* ¶ 13.

[14] *See S.E.C. v. Shavers*, 2014 WL 12622292, at *7 (E.D. Tex. Aug. 26, 2014) (holding cryptocurrency investments offered by the defendant qualified as "securities" and "investment contracts").

[15] Compl. ¶ 13.

[16] Compl., Ex. A, ONYX Software Development Kit License Agreement, § 3.1(c)(i) ("License Agreement").

[17] Compl. ¶ 12.

ONYX.[18]  Mr. Hatcher also began assisting EverID with its mobile application development utilizing the ONYX software.[19]

### 1. *ONYX Software Development Kit License Agreement.*

In September of 2018, Diamond Fortress and EverID finalized the License Agreement for EverID's use of the ONYX software.[20]  The Agreement is valid for a ten-year term and is governed by Delaware law.[21]

The terms and means of compensation are expressly set forth in the Agreement.  Upon execution of the Agreement, an initial license fee of $2,500 U.S. Dollars ("USD") was to be remitted by EverID.[22]  EverID was also obligated to tender "Run-Time Transaction Fees," which equated to fifteen percent (15%) of the gross revenues received from its use of ONYX, to be paid quarterly.[23]  As discussed above, these fees were negotiated away in exchange for a set amount of ID Tokens and subsequent periodic token distributions.

---

[18]  *Id.*

[19]  *Id.*

[20]  Compl., Ex. A, License Agreement.

[21]  *Id.* §§ 11, 17.

[22]  *Id.* § 3.1(a).  The record is unclear whether this payment was ever tendered.

[23]  *Id.* § 3.1(b).

Thus, Diamond Fortress's real economic interest for entering into this transaction—and its concession to give EverID an exclusive license to use ONYX—is EverID's assurance "to engage in a token sale" and award Diamond Fortress for its services accordingly:

> Ten Million (10,000,000) of ID tokens at the ICO or TDE to [Diamond Fortress]. This token grant shall be deemed to be an advance of, and credited to, [EverID] as payment for the Run-Time Transaction Fees. The value of this token grant shall be determined by multiplying the number of tokens granted times the ICO or last TDE price.[24]

Additionally, the token grants are subject to a distribution lock-up, awarding the initial 25% of the tokens at the ICO or final TDE and the remaining 75% to be "distributed in **20** equal **quarterly** distributions" after the ICO or final TDE.[25]

## 2. *Charles Hatcher's Advisor Agreement.*

EverID executed a separate Advisor Agreement with Mr. Hatcher.[26] Under this Agreement, Mr. Hatcher's role was that of an independent contractor to mentor or advise EverID on an as-needed basis.[27]

Mr. Hatcher's compensation structure mostly mirrors Diamond Fortress's, with just a variation in the number of tokens allocated and the distribution schedule.

---

[24] *Id.* § 3.1(c)(i).

[25] *Id.* § 3.1(c)(ii) (emphasis added).

[26] Compl., Ex. B, Advisor Agreement.

[27] *Id.* §§ 1, 5.

EverID was to distribute Two Million Five Hundred Thousand (2,500,000) tokens to Mr. Hatcher at the ICO or final TDE.[28] Similar to Diamond Fortress's lock-up distribution, the initial 25% of the tokens were to be distributed at the ICO or final TDE, with the remaining 75% of tokens to be "distributed in **24** equal **monthly** distributions after the ICO or final TDE."[29]

As some clue as to how the parties intended the ID Tokens be treated or classified, both Agreements expressly provide that the token distributions "will also be subject to regulatory compliance such a [sic] Rule 144 of the Securities Act of 1933 . . . ."[30]

## C. EVERID'S BREACH AND THE INSTANT LITIGATION

EverID's ICO occurred on February 8, 2021, and EverID should have then tendered its first partial payments to the Plaintiffs.[31] EverID didn't.[32] Despite numerous efforts to obtain EverID's assurances that the token distributions were

---

[28] *Id.* § 2.

[29] *Id.* (emphasis added).

[30] *Id.; see also* License Agreement § 3.1(c)(iii) ("[T]he foregoing grants of tokens are subject to . . . (c) regulatory compliance including, but not limited to, lock-ups and restrictions, including but not limited to Rule 144 Restrictions . . . .").

[31] Damages Hr'g Tr., 3-4, *Diamond Fortress Technologies, Inc. v. EverID, Inc.*, N21C-05-048 PRW CCLD, Oct. 28, 2021 (D.I. 27).

[32] *Id.* at 4; *see also* Pls.' Mot. for Default J. ¶ 21, *Diamond Fortress Technologies, Inc. v. EverID, Inc.*, N21C-05-048 PRW CCLD, July 16, 2021 (D.I. 12).

forthcoming—both directly and via counsel—EverID refused to respond or distribute the tokens.[33]

Diamond Fortress and Mr. Hatcher initiated suit here alleging two counts of Breach of Contract—one count for each Plaintiff.[34] Upon EverID's failure to respond or otherwise defend itself, the Plaintiffs filed a motion for default judgment.[35]

Consistent with this Court's Civil Rule 55(b), which provides for entry of default judgment "when a party against whom a judgment for affirmative relief is sought, has failed to appear, plead or otherwise defend as provided by these Rules,"[36] the Court granted the Plaintiffs' motion with respect to EverID's liability for its breaches. EverID's failure to provide any assurance within a reasonable time, as well as its non-performance of payment, constituted a repudiation and total breach of both Agreements.[37] But what then is the remedy?

---

[33] Hr'g Tr. at 5; *see also* Compl. ¶¶ 30-32.

[34] *See generally* Compl.

[35] D.I. 12.

[36] *Campbell v. Robinson*, 2007 WL 1765558, at *1 n.6 (Del. Super. Ct. June 19, 2007) (citing Del. Super. Ct. Civ. R. 55(b)(2)).

[37] Order Granting Pls.' Mot. for Default J. in Part ¶¶ 2-3, *Diamond Fortress Technologies, Inc. v. EverID, Inc.*, N21C-05-048 PRW CCLD, Aug. 24, 2021 (D.I. 17); *see also* Hr'g Tr. at 7, 12-15.

As observed recently, "Delaware law largely remains silent" on scenarios such as this.[38] That said, "significant authority supports the conclusion that a repudiation coupled with simultaneous non-performance gives rise to an action for total breach."[39]

For instance, *Corbin on Contracts* teaches:

> Suppose next that the contract requires performance in installments or continuously for some period and that there has been such a partial failure of performance as justifies immediate action for a partial breach. If this partial breach is accompanied by repudiation of the contractual obligation such repudiation is anticipatory with respect to the performances that are not yet due. In most cases, the repudiator is now regarded as having committed a "total" breach, justifying immediate action for the remedies appropriate thereto . . . . The non-performance plus the repudiation constitute one and only one cause of action.[40]

And though Delaware has not *per se* adopted the Restatement (Second) of Contracts rule regarding repudiation and adequate assurances, our courts have historically relied on its guidance in such situations.[41] The rule prescribes that upon

---

[38] *BioVeris Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530, at *8 (Del. Ch. Nov. 2, 2017), *aff'd*, 2019 WL 244619 (Del. Jan. 17, 2019).

[39] *Id.*

[40] *Id.* at *9 (quoting 9 Arthur Linton Corbin, *Corbin on Contracts* § 954 (interim ed. 2002) (citations omitted)); 10 John E. Murray, Jr., *Corbin on Contracts* § 53.12 (Joseph M. Perillo, ed., rev. ed. 2014) (internal citations omitted)).

[41] *See*, *e.g.*, *Frontier Oil Corp. v. Holly Corp.*, 2005 WL 1039027, at *28 n.184 (Del. Ch. Apr. 29, 2005) (relying on the Restatement regarding "the nature of a demand for adequate assurances[.]").

an obligee's request for adequate assurance of performance by the obligor, "the obligee may treat as a repudiation the obligor's failure to provide" such assurance within a reasonable time.[42] And "a repudiation coupled with simultaneous non-performance gives rise to an action for *total breach*, allowing the non-breaching party to bring an action for the *entire contract price*."[43]

Accordingly, the Court determined EverID had indeed repudiated and was in total breach of both Agreements.[44] Given the novel circumstances of this case, however, a decision on damages was reserved pending further record development. Under this Court's Civil Rule 55(b), "[j]udgment is to be entered by the Court when the plaintiff's claim is for a sum which is uncertain or cannot be fixed with certainty by computation."[45] And when such uncertainty is present, and the Court must "determine the amount of damages[,]" Rule 55(b)(2) authorizes the Court to "conduct such hearings . . . as it deems necessary and proper . . . ."[46]

---

[42]   *Restatement (Second) of Contracts*, § 251 (1981).

[43]   *BioVeris Corp.*, 2017 WL 5035530, at *8 (emphasis added); *see also Mumford v. Long,* 1986 WL 2249, at *3 (Del. Ch. Feb. 21, 1986) (holding where repudiation is found "the non-breaching party is entitled to treat the contract as terminated, *i.e.*, as being at an end").

[44]   Order Granting Pls.' Mot. for Default J. in Part ¶¶ 2-3.

[45]   *Campbell*, 2007 WL 1765558, at *1 n.6 (citing Del. Super. Ct. Civ. R. 55(b)(2)).

[46]   *Id* at n.7.; *see also Dill v. Dill*, 2016 WL 4127455, at *1 (Del. Super. Ct. Aug. 2, 2016) ("After a default judgment is ordered, an inquisition hearing is held to determine the amount of damages due. At an inquisition hearing, the Court's findings on damages must be based on a preponderance of the evidence. The 'sole focus of inquisition hearings is the amount of damages owed to the plaintiff, which is determined by the ... judge.' Preponderance of the evidence means 'the side on

-10-

The Plaintiffs supplemented the record with additional briefing supporting their damages claim.[47]  The Court heard Diamond Fortress and Mr. Hatcher on the supplemented record.   This is the Court's judgment and explication on the computation of damages arising out of EverID's failure to distribute the ID tokens as required under the License and Advisor Agreements.

## II. LEGAL ANALYSIS

### A. CRYPTOCURRENCY, BLOCKCHAIN TECHNOLOGY, AND BITCOIN

It seems no Delaware court has yet grappled with the question posed here: When the consideration to be paid on a contract is in cryptocurrency and the contract is breached, how does the Court calculate the judgment to be entered?

A brief history of cryptocurrency, Bitcoin, and blockchain technology might help one understand the Court's answer here.

Cryptocurrency is a type of digital or virtual currency "maintained by a decentralized network of participants' computers."[48]  Cryptocurrencies are unique

---

which the greater weight of the evidence is found.'  Additionally, the standard remedy, or damages, for a breach of contract is based upon the reasonable expectations of the parties, in an amount that is equal to the loss in value of defendant's nonperformance, or breach.  Damages for a breach of contract must be proven with reasonable certainty. Recovery is not available to the extent that the alleged damages are uncertain, contingent, conjectural, or speculative.") (internal citations omitted).

[47]  D.I. 21.

[48]  *Archer v. Coinbase, Inc.*, 267 Cal. Rptr. 3d 510, 513 (2020).

as they "exist solely on the internet and are unregulated and unmanaged by third parties, such as banks or governments."[49] It uses cryptography for security, and "[l]ike traditional forms of currency, cryptocurrency can be bought and sold on digital exchanges."[50] Like an initial public offering in a securities context, an initial coin offering, or ICO, occurs when a new species of cryptocurrency token is issued in exchange for fiat or already circulating virtual currencies to raise capital.[51]

Cryptocurrency relies on blockchain technology, a distributed ledger system, to ensure the security and integrity of the virtual currency.[52] Blockchain technology is a peer-to-peer system that tracks and records digital transactions around the globe.[53]

> To use a blockchain system, a user first creates a wallet, which contains information used to move units of a cryptocurrency on a blockchain. When the user downloads or purchases a wallet, software in the wallet generates a private key (a large integer number). That private key is then used to mathematically generate a public key (also a large integer number), which is used to create an address (a mix of numbers and symbols). This

---

[49] *Blocktree Props., LLC v. Pub. Util. Dist. No. 2 of Grant Cnty. Washington*, 380 F. Supp. 3d 1102, 1110 (E.D. Wash. 2019).

[50] *Balestra v. Giga Watt, Inc.*, 2018 WL 8244006, at *1 (E.D. Wash. June 18, 2018).

[51] *Id.*

[52] *Zietzke v. United States*, 2020 WL 264394, at *1 (N.D. Cal. Jan. 17, 2020).

[53] Josephine Shawver, *Commodity or Currency: Cryptocurrency Valuation in Bankruptcy and the Trustee's Recovery Powers*, 62 B.C. L. Rᴇᴠ. 2013, 2018 (2021).

address functions as the name suggests:  it is the destination for a cryptocurrency payment.[54]

To avoid risks of double-spending, blockchain places a series of transactions into a block, issues a timestamp, then chronologically incorporates the blocks into a larger chain of all the blocks within the ledger.[55]  "Each block is irreversibly connected by a 'proof-of-work' protocol, the process by which a computer must solve a complex puzzle to authenticate each transaction and add it to the growing blockchain."[56]  This authentication process is known as "mining," or rather, the production of new coins or tokens.[57]

Bitcoin is a well-known name in the cryptocurrency world and is a type of digital currency that uses the blockchain technology.[58]  "Generally speaking, 'Bitcoin' in the capitalized singular refers to the cryptocurrency with the symbol BTC, while 'bitcoin' or 'bitcoins' refers more generally to cryptocurrency, inclusive of the cryptocurrency modeled on Bitcoin."[59]

---

[54]  *Zietzke*, 2020 WL 264394, at *1.

[55]  Shawver, *supra* at 2021.

[56]  *Id.* at 2022.

[57]  *Id*.

[58]  Larissa Lee, *New Kids on the Blockchain: How Bitcoin's Technology Could Reinvent the Stock Market*, 12 HASTINGS BUS. L.J. 81, 90 (2016).

[59]  *BDI Cap., LLC v. Bulbul Invs. LLC*, 446 F. Supp. 3d 1127, 1131 n.3. (N.D. Ga. 2020). *See also United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1251 (S.D. Fla. 2021) (where one litigant

Bitcoin uses the "Bitcoin Blockchain" to track ownership and transfers "of every bitcoin in existence."[60] To transfer bitcoins, a user must have a wallet, which, again, is a unique digital file that stores the bitcoin information.[61] Bitcoins can be acquired either by the mining process or simply by receiving them from someone else.[62] The premise of Bitcoin was to use the blockchain technology for a "peer-to-peer version of electronic cash" that prevents fraudulent spending but without the oversight of regulatory policing.[63]

## B. SECURITY VS. COMMODITY

Incidentally, the lack of regulatory policing of cryptocurrency is not without its problems and is on full display in the instant litigation. Before the Court can fashion a proper damages award, it must first determine how to classify cryptocurrency, *i.e.*, is it a security/investment contract, a commodity, property, or currency?

Lending to this problem is a lack of consensus among certain authorities on how to treat cryptocurrency. For instance, the Commodity Futures Trading

---

characterized Bitcoin as "the most widely adopted form of peer-to-peer cryptocurrency cash-like system in the world.").

[60]   *Kleiman v. Wright*, 2018 WL 6812914, at *1 (S.D. Fla. Dec. 27, 2018).

[61]   *Id.*

[62]   *Id.*

[63]   *See* Shawver, *supra* at 2021.

-14-

Commission (CFTC) insists digital currencies are commodities subject to its regulatory authority.[64] While the United States Securities & Exchange Commission (SEC) determined, in its now-familiar "DAO Report," that virtual currencies are securities subject to the Securities Act of 1933 and the Securities Exchange Act of 1934.[65]

Too, the few courts that have tackled the issue are a bit stuck on the classification quandary.[66] One recently observing the complicator that "several agencies may have concurrent regulatory authority in the cryptocurrency space."[67] Thus, the fact that cryptocurrency may be regulated as an "investment contract"

---

[64] *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 226 (E.D.N.Y. 2018) *adhered to on denial of reconsideration*, 321 F. Supp. 3d 366 (E.D.N.Y. 2018).

[65] *Tetragon Fin. Grp. Ltd. v. Ripple Labs Inc.*, 2021 WL 1053835, at *7, n.87 (Del. Ch. Mar. 19, 2021) (citing SEC, REPORT OF INVESTIGATION PURSUANT TO SECTION 21(A) OF THE SECURITIES EXCHANGE ACT OF 1934: THE DAO (2017), https://www.sec.gov/litigation/investreport/34-81207.pdf)).

[66] *See McDonnell*, 287 F. Supp. 3d at 217 (holding virtual currencies are commodities subject to CFTC regulatory protections); *Lagemann v. Spence*, 2020 WL 5754800, at *11-12 (S.D.N.Y. May 18, 2020) (holding that plaintiffs had established their right to a judgment under the CEA after the defendant misappropriated their cryptocurrency investments); *CFTC v. Gelfman Blueprint, Inc.*, 2018 WL 6320653, at *4 (S.D.N.Y. Oct. 2, 2018) (holding virtual currencies are encompassed in the definition of commodity under the Commodity Exchange Act); *contra S.E.C. v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) (holding that a company's public sale of virtual currency was an investment contract subject to SEC registration requirements); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) (holding that digital tokens are considered securities).

[67] *United States v. Samuel Reed*, 2022 WL 597180, *4 (S.D.N.Y. Feb. 28, 2022).

under the Securities Act of 1933, "does not mean that a cryptocurrency is not a 'commodity' within the meaning of the [Commodity Exchange Act or] CEA."[68]

In mid-2021, Congress introduced the Digital Asset Market Structure and Investor Protection Act—a bill providing for the regulation of digital assets and digital asset securities.[69] The proposed bill includes amendments to current federal securities laws and the CEA, defining and distinguishing a "digital asset" versus a "digital asset security" under the respective bodies of law.[70]

In short, under the proposed legislation, it appears a cryptocurrency's *characteristics* at a given time best determine whether it is subject to SEC or CFTC regulation (*e.g.*, an ICO is generally considered a security because its purpose, like an IPO, is to raise capital by selling new tokens or coins to investors).[71]

Within one-hundred-fifty (150) days of the bill's enactment, the SEC and CFTC are to jointly publish "a proposed rulemaking that classifies each of the major digital assets by (i) highest market capitalization and (ii) highest daily trading

---

[68]   *Id.*

[69]   Digital Asset Market Structure and Investor Protection Act, H.R. 4741, 117th Cong. (2021).

[70]   *Id.*

[71]   Eva Su, *Digital Assets and SEC Regulation*, CONGRESSIONAL RESEARCH SERVICE (June 23, 2021) https://sgp.fas.org/crs/misc/R46208.pdf ("When a digital asset meets the criteria defining a security, it would be subject to securities regulation, per existing SEC jurisdiction. For example, most of the initial coin offerings (ICOs) are securities, but Bitcoin is not a security, mainly because it does not have a central third-party common enterprise.").

volume as either (1) a digital asset; or (2) a digital asset security."[72]  Notably, in

defining "major digital assets," the mandate refers the CFTC and SEC to

"CoinMarketCap" as "an appropriate publicly available website" that publishes data

on digital assets.[73]

### C. THE SEC, *HOWEY*, AND CRYPTOCURRENCY AS AN INVESTMENT CONTRACT

The Securities Act of 1933[74] and the Securities Exchange Act of 1934[75]

regulate the issuance and sales of investment products that qualify as securities under

each Act.  Congress's intent in enacting these laws "was to regulate *investments*, in

whatever form they are made and by whatever name they are called."[76]  This was to

ensure the application of securities laws would "turn on the economic realities

underlying a transaction, and not on the name appended thereto."[77]

Among many other investment-related terms, Section 77b(a)(1) of the 1933

Act defines a "security" to mean an "investment contract."[78]  The United States

---

[72]  *See* HR 4741.

[73]  *Id.* As of the date of this Opinion, the proposed legislation has yet to be enacted.

[74]  15 U.S.C. § 77a *et seq.*

[75]  15 U.S.C. § 78a *et seq.*

[76]  *S.E.C. v. Edwards*, 540 U.S. 389, 393 (2004) (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990)) (emphasis in original).

[77]  *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975).

[78]  15 U.S.C. § 77b(a)(1) (2021) (Definitions; promotion of efficiency, competition, and capital formation).

Supreme Court animated those terms via the now well-accepted *Howey* test: an investment contract is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."[79] This definition "embodies a flexible rather than a static principle, one that is capable of adaption to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."[80]

Not surprisingly, courts have looked to *Howey* to ascertain whether cryptocurrencies qualify as an unconventional scheme or contract that is governed by securities laws.[81] "Whether a transaction or instrument qualifies as an investment contract is a highly fact-specific inquiry."[82] A court must "examine the series of understandings, transactions, and undertakings *at the time they were made*."[83] Accordingly, an application of the *Howey* test "requires an examination of the entirety of the parties' understandings and expectations."[84]

---

[79] *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).

[80] *Id.* at 299.

[81] *See, e.g.*, *S.E.C. v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 364–65 (S.D.N.Y. 2020).

[82] *United States v. Zaslavskiy*, 2018 WL 4346339, at *4 (E.D.N.Y. Sept. 11, 2018).

[83] *Telegram*, 448 F. Supp. 3d at 368 (emphasis added).

[84] *See id.* at 379 (citing *Howey*, 328 U.S. at 297-98).

**1.** *Courts Applying* **Howey** *Have Determined Cryptocurrency is a Security.*

### a. Investment of Money

The first consideration under *Howey* is "whether an investment of money was part of the relevant transaction."[85] An investment of money "need not be made in cash and refers more generally to 'an arrangement whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to financial losses.'"[86] Several federal district courts have recently had occasion to apply *Howey* in digital currency contexts. And in each, the first prong was rather easily met.

For example, one court determined the plaintiff-investors' assets that were contributed in advance of a scheduled ICO—"even if such investments were in the form of cryptocurrencies"—was satisfactory.[87] In another similar matter, the plaintiff-investors' exchange of one form of cryptocurrency for a number of forthcoming digital coins that the defendant marketed and promised to distribute at its ICO event satisfied the investment-of-money prong.[88] And finally, this criterion

---

[85] *Id.* at 368.

[86] *Hodges v. Harrison*, 372 F. Supp. 3d 1342, 1348 (S.D. Fla. 2019) (quoting *S.E.C. v. Friendly Power Co. LLC*, 49 F. Supp. 2d 1363, 1368-69 (S.D. Fla. 1999)); *see also Uselton v. Comm. Lovelace Motor Freight, Inc.,* 940 F.2d 564, 574 (10th Cir. 1991) ("[I]n spite of *Howey's* reference to an 'investment of money,' it is well established that cash is not the only form of contribution or investment that will create an investment contract.").

[87] *Hodges*, 372 F. Supp. 3d at 1348.

[88] *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 347, 353 (S.D.N.Y. 2019).

was satisfied in yet another case where the investors' initial contributions in the form of dollars and euros were in exchange for the future delivery of the defendants' soon-to-be-launched cryptocurrency.[89]

### b. Common Enterprise

The Court next looks to see if "a common enterprise exists where the 'fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment of third parties.'"[90] Often considered here is whether "horizontal commonality" or "vertical commonality" inheres in the arrangement.[91] Horizontal commonality requires one to show a "pooling" of the investors' interests or assets, such that all involved share in the profits and risks of the enterprise alike.[92] While vertical commonality "requires that the fortunes of investors be tied to the *fortunes* of the promoter."[93]

ICOs have constituted a common enterprise because the investees "pool" the contributed funds for the purpose of securing a profit for themselves and the

---

[89]  *Telegram*, 448 F. Supp. 3d at 368-69.

[90]  *Hodges*, 372 F. Supp. 3d at 1348 (quoting *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999)).

[91]  *Telegram*, 448 F. Supp. 3d at 369.

[92]  *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

[93]  *Id*. at 88 (emphasis in original); *see also In re J.P. Jeanneret Assocs.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) (holding "that strict vertical commonality (like horizontal commonality) is sufficient to establish a common enterprise under *Howey*").

investors, and the risks and benefits are shared equally among the parties.[94]

Horizontal commonality has been found to exist both before *and* after the launch of a defendant's cryptocurrency and blockchain platform.[95] Where one initially "pools" his investors' money in order to develop and launch a digital token and blockchain platform, he effectively renders his investors' profits entirely dependent upon the blockchain's successful launch.[96] If the launch is unsuccessful, the investors are equally affected and lose any opportunity to profit.[97] Horizontal commonality can also exist *post-launch* because the value of each token to be distributed thereafter is "dictated by the success [or failure] of the [blockchain] enterprise as a whole."[98] So the "plain economic reality" post-launch is that the distribution of the tokens continues to represent the investors' initial pooled funds.[99]

---

[94] *Hodges*, 372 F. Supp. 3d at 1348.

[95] *Telegram*, 448 F. Supp. 3d at 369-70; *see also Balestra*, 380 F. Supp. 3d at 353-54 (plaintiffs plausibly demonstrated the "pooling of the investors' funds" because the "Defendants encouraged investors to purchase ATB Coins based on the claim that the speed and efficiency of the ATB Blockchain would result in an increase in the coins' value"); *Revak*, 18 F.3d at 87 (holding "horizontal commonality" exists where the investors' profits are tied "to the success of the overall venture").

[96] *Telegram*, 448 F. Supp. 3d at 369-70.

[97] *Id.*

[98] *Id.* at 370.

[99] *Id.* at 369; *see also Balestra*, 380 F. Supp. 3d at 354 (finding a pooling of investments after the launch of a digital asset).

### c. **Expectation of Profits Derived Solely from the Efforts of Others**

The final *Howey* factor is whether an investor entered into a transaction expecting to make a profit. "An investor possesses an expectation of profit when their motivation to partake in the relevant 'contract, transaction or scheme' was 'the prospects of a return on their investment.'"[100] A profit has been interpreted to mean an "income or return, to include, for example, dividends, other periodic payments, or the increased value of the investment."[101] Here, a court considers "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."[102]

This criterion is satisfied where investors' fortunes are "directly tied to the failure or success of the products the [investee] purport[s] to develop, and no individual investor c[an] exert control over the success or failure of his or her investment."[103] Indeed, an investor's expectation of profits relies on the "essential efforts" of investee when he or she wholly depends on that investee "to develop,

---

[100] *Telegram*, 448 F. Supp. 3d at 371 (citing *Howey*, 328 U.S. at 301).

[101] *S.E.C. v. Edwards*, 540 U.S. 389, 394 (2004).

[102] *Bamert v. Pulte Home Corp.*, 445 F. App'x. 256, 262 (11th Cir. 2011) (quoting *S.E.C. v. Glenn W. Turner Enters.*, 474 F.2d 476, 482 (9th Cir. 1973)).

[103] *Hodges*, 372 F. Supp. 3d at 1348.

launch, and support the [blockchain]."[104]

In finding whether investors were "led to expect profits solely from the efforts" of the investee-defendants, one court was particularly persuaded by the defendants' marketing materials.[105] In that case, the investors were induced by the defendants' marketing materials touting the potential profitability of their coins as well as their sole responsibility for developing and launching the blockchain platform—"the performance of which largely dictated the value of [the coins]."[106] Thus, it was the investee-defendants' "essential managerial efforts which affect the failure or success of the enterprise" that the investor-plaintiffs relied on to yield a return on their investment.[107]

## D. "ID TOKENS" IS A SECURITY

Courts commonly classify a cryptocurrency as a security when the economic harm directly relates to or arises from its ICO.[108] The proposed federal legislation

---

[104] *Telegram*, 448 F. Supp. 3d at 375-79 (holding the totality of the evidence and economic realities indicate that defendants' initial sales of the coins were part of a larger scheme, manifested by its "actions, conduct, statements, and understandings . . . with the intent and purpose that the [coins] be distributed in a secondary public market, which is the offering of securities under *Howey*").

[105] *Balestra*, 380 F. Supp. 3d at 357.

[106] *Id.*

[107] *Id.* at 355-57.

[108] *See S.E.C. v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) (holding that a company's public sale of virtual currency was an investment contract subject to SEC registration

seeking to resolve the classification question, too, draws the line at the ICO. Just like any security, the purpose of an ICO is to *raise capital* by selling *new* coins or tokens to investors. Here, EverID's failure to distribute the due ID Tokens on the date of the ICO is the direct cause of the Plaintiffs' injury, *i.e.*, the ICO is the triggering event underlying this litigation.

Scrutiny under *Howey* of ID Tokens' characteristics, its distribution scheme, and the transaction mapped out by the Agreements leads inexorably to its classification as a security.

### 1. *ID Tokens is a Security Under* **Howey.**

At bottom, the Plaintiffs invested their expertise and proprietary resources to EverID's cryptocurrency enterprise, solely relying on EverID's development and management of the blockchain platform to yield a return on their investment.

#### a. <u>Investment of Money</u>

To determine "whether an investment of money was part of the relevant transaction",[109] our courts have been clear that money *per se* isn't required to satisfy the first prong of *Howey*.[110] All that's required is an investor who "commits assets

---

requirements); *see also Balestra*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019); *Telegram*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020); *Hodges v. Harrison*, 372 F. Supp. 3d 1342 (S.D. Fla. 2019).

[109] *Telegram*, 448 F. Supp. 3d at 368.

[110] *Uselton v. Comm. Lovelace Motor Freight, Inc.,* 940 F.2d 564, 574 (10th Cir. 1991).

to an enterprise or venture in such a manner as to subject himself to financial losses."[111]

The Plaintiffs committed both an exclusive license to their ONYX software and related professional services to EverID's then-developing, blockchain-based cryptocurrency platform. In turn, the Plaintiffs elected to be paid in eventual token distributions rather than by traditional means—knowing full well that cryptocurrency value is ever-fluctuating.[112] The Plaintiffs "bore the risk of those fluctuations by agreeing to accept the cryptocurrency as payment instead of dollars" and subjected themselves to any attendant financial losses.[113] So, the first prong of *Howey* is satisfied here.

### b. **Common Enterprise**

"[A] common enterprise exists where the 'fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment of third parties.'"[114] EverID relied on the Plaintiffs' software license and professional services (*i.e.*, Plaintiffs' investments) to successfully develop and

---

[111] *S.E.C. v. Friendly Power Co. LLC*, 49 F. Supp. 2d 1363, 1368-69 (S.D. Fla. 1999).

[112] Hr'g Tr. at 10.

[113] *Id.*

[114] *Hodges*, 372 F. Supp. 3d at 1348 (quoting *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999)).

launch its blockchain platform. And in turn, the Plaintiffs' ability to recover any remuneration for their investment was interwoven with and wholly dependent upon the successful launch of EverID's blockchain. In other words, it was EverID's efforts—using Plaintiffs' investments—to develop a successful token that created a common enterprise.

It "is the nature of a common enterprise, to pool invested proceeds to increase the range of goods and services from which income and profits could be earned."[115] And the economic reality of this transaction—pre- and post-ICO—is that any future distribution, or continued growth of ID Tokens' value, is representative of the Plaintiffs' investments in EverID's blockchain platform.[116] The value of each subsequent token distribution is "dictated by the success of the [blockchain] enterprise as a whole."[117] And so, *Howey*'s common enterprise criterion is met.

### c. Expectation of Profits Derived from the Efforts of Others

The third *Howey* factor also exists here. No doubt, Plaintiffs had "an expectation of profit when their motivation" to enter into the negotiated Agreements was based on the promise of payment in the form of (and profit from) token

---

[115] *Kik Interactive Inc.*, 492 F. Supp. 3d at 179.

[116] *See Balestra*, 380 F. Supp. 3d at 354 (finding a pooling of investments *after* the launch of a digital asset).

[117] *Id.*

distributions.[118]  EverID's successful development and launch of the ID Tokens' enterprise was integral to the Plaintiffs' "prospects of a return on their investment."[119]

The Plaintiffs acquiesced to EverID's demand for an exclusive ONYX software license on the condition that EverID allocate and distribute a significant amount of ID Tokens at the ICO.  The token grant wasn't in addition to payment for Plaintiffs' services, but rather *in lieu of* traditional compensation for their contributions to EverID.[120]  Notwithstanding the attendant risks involved with cryptocurrency transactions, the substantial deferral of payment for their services, and the onerous distribution lock-up, the Plaintiffs reasonably believed this compensation arrangement would provide a proportional return of profit in relation to their initial investment.

Because the Plaintiffs could not be reimbursed until after EverID's initial ICO, their expected profits "were directly tied to the failure or success" of EverID's blockchain platform.[121]  Their dependence on EverID "to develop, launch, and

---

[118]  *Telegram*, 448 F. Supp. 3d at 371 (citing *Howey*, 328 U.S. at 301).

[119]  *Id.*

[120]  *See generally* License and Advisor Agreements.

[121]  *Hodges*, 372 F. Supp. 3d at 1348.

support the [blockchain]" is sufficient to find that the Plaintiffs' expectation of profits relied on the "essential efforts" of EverID.[122]

The economic reality of the parties' entire transaction here establishes each *Howey* factor. The Plaintiffs' overall investment into the platform was based on their expectation to be paid in eventual distributions of ID Tokens after the ICO. This expectation is no different than that of a traditional investment contract entered into before an IPO, and thus, ID Tokens is in this circumstance like a security.[123]

### 2. *Both License Agreements Expressly Require Adherence to SEC Regulatory Compliance.*

Delaware law governs the parties' respective License Agreements,[124] and in Delaware, a contract's proper construction is a question of law.[125] The goal of contract interpretation "is to fulfill the parties' shared expectations at the time they contracted."[126]

The parties took care to include language in *both* Agreements that token distributions were subject to regulatory compliance under Rule 144 of the Securities

---

[122] *Telegram*, 448 F. Supp. 3d at 375-79.

[123] *Id*. at 379 (citing *Howey*, 328 U.S. at 297-98) (requiring "an examination of the entirety of the parties' understandings and expectations").

[124] Compl., Ex. A, License Agreement § X2-6.3.

[125] *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266–67 (Del. 2017).

[126] *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (internal quotation marks omitted).

Act of 1933.[127] The Licensing Agreement also subjects token grants to "verification as an accredited investor, unless [User's Board], in its discretion, utilizes another valid exemption outside of, and separate from, its token offering under 506(c) such as Rule 701 . . . ."[128]

Because the Court's role is to "give priority to the parties' intentions as reflected in the four corners of the [A]greement,"[129] it is manifest from each Agreement that the parties intended to treat the ID Tokens at each distribution as a security. Surely, it is not mere happenstance the parties included these references to SEC regulations in each Agreement.

The Agreements were signed almost one month apart, the later-signed Advisor Agreement doesn't mimic the terms of License Agreement, and both Agreements include language the other does not. Most notably, the provisions referencing the SEC regulations are phrased differently in each. This suggests nothing other than the parties deemed it prudent to include the regulatory compliance

---

[127] Compl., Ex. B, Advisor Agreement; *see also id.* at Ex. A, License Agreement § 3.1(c)(iii) ("[T]he foregoing grants of tokens are subject to . . . (c) regulatory compliance including, but not limited to, lock-ups and restrictions, including but not limited to Rule 144 Restrictions . . . .").

[128] *Id.*, Ex. A, License Agreement § 3.1(c)(iii). Rule 506(c) is the S.E.C.'s "small business exempt offerings" rule that governs general solicitations and advertisements of a public offering. *See* U.S. SECURITIES AND EXCHANGE COMM'N, GENERAL SOLICITATION-RULE 506(C) (2022), https://www.sec.gov/smallbusiness/exemptofferings/rule506c.

[129] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

references in both Agreements and anticipated treating the ICO and forthcoming distributions like those of a security.

## III. DAMAGES

"Under Delaware law, the standard remedy for breach of contract is based on the reasonable expectations of the parties that existed before or at the time of the breach."[130]  It is well-settled that breach of contract damages "are designed to place the injured party . . . in the same place as he would have been if the contract had been performed.  Such damages should not act as a windfall."[131]  Accordingly, when assessing such damages, "the non-breaching party is entitled to recover 'damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made.'"[132]

But in a case such as this—where the damages were unforeseeable at the time of contracting and it cannot be determined what the Plaintiffs would have received had the contract been performed—how does the Court fashion a reasonable remedy that accounts for: (1) the volatile and unregulated nature of cryptocurrency; (2) the express terms of the Agreements requiring immediate distribution of 25% of the total

---

[130] *Siga Tech., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1132-33 (Del. 2015) (citing *Duncan v. Theratx, Inc.,* 775 A.2d 1019, 1022 (Del. 2001)).

[131] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009).

[132] *Id.* (quoting *Tackett v. State Farm Fire & Cas. Ins. Co.,* 653 A.2d 254, 264–65 (Del.1995)).

token grant at the ICO (a concrete and discernible amount); and (3) the remaining periodic token distributions whose values are so unpredictable that a blanket damages calculation indeed could operate as a windfall?

The damages calculation here is two-fold. First, the Court must find a reliable cryptocurrency valuation source to ensure the proper input of values. Then the Court must ascertain the proper method for calculating the damages such that it will place the Plaintiffs in the same position they would have been had the Agreements been fully performed.

## A. PROPER VALUATION SOURCE – COINMARKETCAP

The few courts that have endeavored to do so have found CoinMarketCap to be a "reliable valuation tool" for determining the USD value of cryptocurrency tokens.[133] As one rightly observed, "CoinMarketCap is used frequently by news publications to report on prices of virtual currencies, including publications that focus on virtual currencies such as CoinDesk and general financial newspapers like the Wall Street Journal and the Financial Times."[134]

---

[133] *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 670–71 (E.D.N.Y. 2018); *CFTC v. Reynolds*, 2021 WL 796683, at *4 n.2 (S.D.N.Y. Mar. 2, 2021) (citing *McDonnell*, 332 F. Supp. 3d at 670–71) (holding "CoinMarketCap is a reliable valuation tool for these purposes"); *Hodges v. Harrison*, 372 F. Supp. 3d 1342, 1353 n.1 (S.D. Fla. 2019) (holding an evidentiary hearing "to determine the appropriate manner of calculating the value of Plaintiffs investments" before determining CoinMarketCap was a reliable source to convert cryptocurrency into USD).

[134] *McDonnell*, 332 F. Supp. 3d at 670–71.

Tellingly, Congress's proposed Digital Asset Market Structure and Investor Protection Act encourages the SEC and CFTC to publish joint rulemaking concerning digital asset classification.[135] And in so doing, it nods to CoinMarketCap as "an appropriate publicly available website . . . that publishes" data on digital assets.[136]

Against this backdrop, the Court is satisfied CoinMarketCap is a reliable cryptocurrency valuation tool. As such, the Court will rely on historical pricing data published by CoinMarketCap to determine the proper USD value of ID Tokens in calculating the Plaintiffs' forthcoming judgment.

## B. PROPER VALUATION METHOD

The Plaintiffs posit EverID's failure to distribute the ID Tokens is analogous to Delaware's "failure to deliver securities" cases, where damages are determined by the highest market price of the security within a reasonable time of a plaintiff's discovery of the breach.[137]

Just so. But for the novelty of the subject instrument being units of cryptocurrency this suit mirrors any other failure to deliver securities case—a run-

---

[135] Digital Asset Market Structure and Investor Protection Act, H.R. 4741, 117th Cong. (2021).

[136] *Id.*

[137] Pls.' Mot. for Default J. ¶ 28 (citing *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1 (Del. Ch. 1992)).

of-the-mill action for Delaware courts.  The Court will, therefore, calculate the Plaintiffs' forthcoming judgment applying established Delaware precedent.

### 1. *Highest Value Within a Reasonable Time.*

Known as the New York Rule, the "highest value within a reasonable time" framework is a judicially-created breach-of-contract remedy for reckoning "damages where stock or 'properties of like character' were converted, not delivered according to contractual or other legal obligation, or otherwise improperly manipulated."[138]  It's frequently employed in wrongful stock conversion litigation and measures damages by: "the highest intermediate value reached by the stock between the time of the wrongful act complained of and a reasonable time thereafter, to be allowed to the party injured to place himself in the position he would have been in had not his rights been violated."[139]

This slight variation of the old English rule—which measured damages by the highest value of the stock on or before the day of trial[140]—allows for a more just

---

[138] *Schultz v. CFTC*, 716 F.2d 136, 141 (2d Cir. 1983) (citing *McKinley v. Williams*, 74 F. 94, 103 (8th Cir. 1896)).

[139] *Id.* at 139-40 (quoting *Galigher v. Jones*, 129 U.S. 193, 200 (1889)); *see also McKinley*, 74 F. at 102-03 (holding the "true and just measure of damages" is "the highest intermediate value of the stock between the time of its conversion and a reasonable time after the owner has received notice of it to enable him to replace the stock").

[140] *Galigher*, 129 U.S. at 201.

recovery.[141] The rule was modified in an effort to alleviate the drastic fluctuating values of the asset—yet another a hardship borne by the victim—since trial was an event that often occurred long after the conversion.[142] So in the case of volatile-stock values, the modification allows recovery for those "profits possibly lost as a result of the wrongful conduct."[143]

For practical reasons, the modified rule doesn't require the injured party to "reenter the market."[144]

> The value of lost securities may rise dramatically the day after a wrongful conversion and then embark on a prolonged downward spiral. Had the owner of such securities not been wrongfully parted with them, he might well have been prompted to sell them within a few days, as their value began to plummet. To require him actually to reenter the market and repurchase the same securities as a predicate for a damage claim, when steadily falling prices render such an investment imprudent, would frustrate the rule which seeks to make an investor whole. Rather than mitigating damages, as this example illustrates, a requirement that there be an actual repurchase could result in an *increase* in damages.[145]

But the rule is careful to avoid windfall awards to injured parties. Should the highest value occur *after* the stock has been converted, but *before* the injured party

---

[141] *Schultz*, 716 F.2d at 140.

[142] *Id.*

[143] *Id.*

[144] *Id.*

[145] *Id.* (emphasis in original).

learns of the conversion, he cannot rely on that value for his damages.[146] No, the injured party's "reasonable time" period begins *after or upon* the date the conversion is discovered.[147]

Accordingly, the measure of damages for wrongful conversion of stock or properties of like character is the higher value of either: "(1) its value at the time of conversion or (2) its highest intermediate value between notice of the conversion and a reasonable time thereafter during which the stock could have been replaced . . . ."[148]

## 2. *Delaware Follows the New York Rule*.

Our Court of Chancery adopted the New York rule in *American Gen. Corp. v. Continental Airlines Corp.*, where it was asked to determine the value of damages for improperly converted stock options.[149]

There, the plaintiffs recommended "a variation of the damage formula used in cases involving the conversion of securities of fluctuating value . . . [that is] based on the highest market price the stock reached within a reasonable time of plaintiff's

---

[146]  *Id.* at 140-41.

[147]  *Id.* at 141.

[148]  *Id.* at 141.

[149]  622 A.2d 1 (Del. Ch. 1992).

discovery of the breach."[150]  The court accepted the recommended "highest market price of the stock" approach, but modified the amount because the date the plaintiffs used was arbitrary and self-serving.[151]  Instead, the court used the date the plaintiff's became absolutely entitled to be issued the options because that was the date the stockholders "approved the Employee Option" at issue in the litigation.[152]

Now, "[w]hat constitutes a reasonable period of time is a question of law for the court to determine."[153]  A plaintiff can't cherry-pick dates to trump up the maximal value.[154]  "Rather, the date should be established by resort to a 'constructive replacement' purchase by the plaintiff, *i.e.*, how long it would have taken the plaintiff to replace the securities on the open market."[155]  Two or three months has been accepted as a reasonable period of time to replace an asset on the open market.[156]

---

[150]  *Id.* at 8.

[151]  *Id.* at 11-13.

[152]  *Id.* at 8, 14.

[153]  *Segovia v. Equities First Holdings, LLC*, 2008 WL 2251218, *21 (Del. Super. Ct. May 30, 2008).

[154]  *Am. Gen. Corp*, 622 A.2d at 13.

[155]  *Id.* (citing *Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 597, 609 (S.D.N.Y. 1977)).

[156]  *Segovia,* 2008 WL 2251218, at *22 (finding three months was appropriate for determining damages); *see also Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 20 (Del. Ch. 2003) (calculating damages within a 90-day period because the parties' agreement gave the plaintiff ninety days from date of vesting to sell the disputed shares); *Galigher v. Jones*, 129 U.S. 193, 199-200 (1889) (affirming two-months' time was appropriate for calculating damages).

## C. APPLICATION OF METHOD AND SOURCE

The Court is satisfied that the New York Rule is the proper method, and CoinMarketCap is the proper valuation source, to calculate the Plaintiffs' damages. Too, the Court is satisfied this approach best represents the parties' intentions at the time of contracting.[157] So Diamond Fortress's and Mr. Hatcher's damages will be calculated by multiplying the total tokens awarded under the respective Agreements by ID Tokens' highest intermediate value within three months of the discovery of EverID's breach.

Between the ICO date of February 8, 2021, and through March 4, 2021, the Plaintiffs attempted to contact EverID to discuss then-due token distributions and obtain adequate assurances of payment. After hearing crickets, the Plaintiffs sent their final communication to EverID on March 4, 2021, declaring their intent to treat the Agreement as breached and to pursue legal remedies. March 4 is therefore the date the Plaintiffs became absolutely entitled to issuance of their ID Tokens. Hence, the proper three-month "reasonable time" period ran from March 4, 2021, to June 3, 2021.

CoinMarketCap recorded and published the daily values of ID Tokens during that March 4, 2021 to June 3, 2021 span. The highest market price within that time

---

[157] *See* Compl., Ex. A, License Agreement at § 3.1(c)(i) (containing unambiguous references to SEC regulatory compliance).

period was recorded on April 9, 2021, at a value of 2.01 USD.[158]

Consequently, the Plaintiffs' base damages are calculated as follows:

|  | **DIAMOND FORTRESS TECHNOLOGIES** | **CHARLES HATCHER, II** |
|---|---|---|
| Total Tokens Awarded | 10,000,000 | 2,500,000 |
| Highest Value of ID Tokens from 3/4/2021–6/3/2021 | $2.01 | $2.01 |
| **TOTAL BASE DAMAGES TO BE AWARDED** | **$20,100,000.00** | **$5,025,000.00** |

Plaintiffs are also awarded pre-judgment interest on the above total figures, at the statutory rate accruing from March 4, 2021, the date they became absolutely entitled to the token distributions, until the entry date of this Opinion and Order.[159] Plaintiffs are further entitled to post-judgment interest, again at the statutory rate, accruing as of the entry date of this Opinion and Order.[160]

---

[158] Pls.' Suppl. Submission in Supp. of Mot. for Default J., Ex. A, CoinMarketCap "Historical Data for Everest" (https://coinmarketcap.com/currencies/everest/historical-data/).

[159] *See* DEL. CODE ANN. tit. 6, § 2301 (2012); *see also Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011) (holding that "prejudgment interest in Delaware cases is awarded as a matter of right").

[160] *See Wilmington Country Club v. Cowee*, 747 A.2d 1087, 1097 (Del. 2000) (observing that post-trial interest "is a right belonging to the prevailing plaintiff and is not dependent upon the trial court's discretion").

## IV. CONCLUSION

For reasons set forth herein, judgment for both Diamond Fortress and Mr. Hatcher shall be entered accordingly. Within 20 days of entry of this Opinion and Order, their counsel shall submit to the Court a proposed form of final judgment that incorporates the Court's award, including pre- and post-judgment calculations.

**IT IS SO ORDERED**.

_____
Paul R. Wallace, Judge

Original to Prothonotary
cc: All Counsel via File & Serve